OPINION
JULIA SMITH GIBBONS, Circuit Judge.
In this death penalty case, Warden David Bobby appeals the district court’s order granting William T. Montgomery’s petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 and its denial of the State’s subsequent motion to reconsider that order under Federal Rule of Civil Procedure 59(e). See Montgomery v. Bagley, 482 F.Supp.2d 919 (N.D.Ohio 2007). Although Montgomery asserted forty-eight grounds for relief in the petition, the district court granted the writ based upon a single ground: the State’s non-disclosure of an exculpatory pretrial police report, in which several witnesses claimed to have seen one of the victims alive several days after her alleged murder, violated the Supreme Court’s precedent in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Montgomery, in turn, cross-appeals the district court’s denial of his petition on several alternative grounds, including the trial court’s retention of a juror undergoing psychiatric treatment, the trial court’s denial of Montgomery’s motion to change venue in light of negative pretrial publicity, and the State’s non-disclosure of other allegedly exculpatory evi *671 dence. For the reasons that follow, we reverse the district court’s issuance of the writ of habeas corpus and affirm the district court in all other respects.
I.
On the morning of March 8, 1986, the police found Cynthia Tincher’s body in her car at the corner of Angola and Wenz Roads in Toledo, Ohio. She had been killed by a single gunshot wound to the head. On the same morning, when Tincher’s roommate, Debra Ogle, failed to appear for work, the police listed Ogle as missing. The police located Ogle’s abandoned car the following day, although no sign of Ogle existed. On March .11, 1986, acting on a tip from a jailhouse informant, Michael Clark, the police located and questioned Glover Heard in connection with the murder of Tincher and the disappearance of Ogle. At approximately 2:30 p.m. that afternoon, the police brought Heard to the station house, where he provided an initial statement, offering the name of Edward Bruce Ellis as an alibi witness. When interviewed about Heard’s alibi on March 11, Ellis, in turn, gave the police the name of the petitioner, William Montgomery.
At about noon on March 12, 1986, while Ogle still remained missing, the police located Montgomery at the home of his uncle, Randolph Randleman. Montgomery stated that he knew the police were looking for him and that he wanted to discuss the homicide. The police then arrested Montgomery pursuant to an outstanding forgery warrant and brought him to the station house, where he was questioned about the death of Tincher and disappearance of Ogle. During the interview, Montgomery admitted that his gun, a Bersa .380-caliber semi-automatic pistol, was the murder weapon. In his initial statement, Montgomery claimed that, following a night of drinking, he gave Heard the pistol in the early morning hours of March 8 for Heard’s self-protection on his walk home. Montgomery further claimed that Heard had returned the gun to him later that morning with an empty six-round clip and told Montgomery that Heard had shot and killed both Tincher and Ogle. Montgomery stated that Heard had not disclosed the location of Ogle’s body. During subsequent questioning that afternoon, Montgomery changed his statement, admitting that he and Heard had taken a taxi to Tincher and Ogle’s apartment on Hill Avenue on the morning of March 8, where they asked Ogle for a ride home. Montgomery stated that Ogle provided a ride to both men after she finished getting ready for work and dropped Montgomery off at his apartment first. He maintained, nevertheless, that Heard had killed both women with his Bersa .380, which Heard had borrowed.
During questioning, Montgomery insisted that, if the police recovered his gun, they would find that it was, in fact, the murder weapon that Heard had used. In an effort to locate the gun, the police permitted Montgomery to make several phone calls. After the calls, Montgomery’s mother, Caroline Jones, called the police station and arranged to meet an officer at the Way-Lo gas station near the airport at approximately 6 p.m. Upon meeting the officer, Jones turned over a bag containing a loaded .380-caliber semi-automatic pistol.
On the evening of March 12, 1986, the police formally charged Montgomery with the aggravated murder of Tincher. At this point, Montgomery informed the police that he could help them locate Ogle’s body near a market on Hill Avenue. Although he continued to implicate Heard as the killer — and stated that Heard had driven him by the location of Ogle’s body — Montgomery directed the police to a wooded area separated by a field off of *672 Hill Avenue, which he identified as the location. As Montgomery waited in the patrol car with Sergeant Larry Przeslawski, officers began searching the wooded area to the left of the field. Montgomery then told Sergeant Przeslawski to instruct the officers to search the wooded area to the right of the field, where Ogle’s body was recovered.
On March 25, 1986, the Lucas County Grand Jury returned a two-count indictment charging Montgomery with the aggravated murders of Ogle and Tincher while committing or attempting to commit aggravated robbery, in violation of Ohio Rev.Code Ann. § 2903.01(B) (West 2002). On September 29, 1986, the case proceeded to a jury trial, in which the State argued that Montgomery murdered Ogle while robbing her with the use of a deadly weapon and, in a continuous criminal enterprise, then murdered Tincher, as she was the only person who could place Montgomery with Ogle that morning. To support this theory, the State presented thirty-two witnesses, including several police officers and Heard, who had also been indicted for the aggravated murders of Ogle and Tincher, but who pled guilty to one count of complicity to murder. At trial, the State presented the following evidence through witness testimony and exhibits:
• Montgomery had purchased a .380 caliber semi-automatic pistol and ammunition just weeks before the murders ... [and] was wearing a dark hooded jacket with the hood tied tight around his face when he entered the gun shop to purchase the pistol;
• Montgomery and [Tincher and Ogle] were acquaintances ... [and] [b]oth young women were alive the night of March 7th and the early morning hours of March 8th;
• Montgomery, Heard, another friend, Bruce Ellis, and Montgomery’s then girlfriend, Louren, went out drinking on the night of March 7th;
• Montgomery was wearing a blue pin striped suit jacket and jeans that night;
• Later in the morning of March 8th, Montgomery, Louren, and Heard went to Montgomery’s uncle’s house, where a very drunk Montgomery was arguing with Louren until his uncle broke it up;
• After defusing the argument, Montgomery’s uncle, Randleman, took a gun away from Montgomery and put it and its clip on top of the refrigerator;
• Montgomery and Heard then left the Randleman residence, both passing through the kitchen where the gun was on top of the refrigerator, to get in a cab;
• Montgomery was armed with a .380 caliber pistol the morning of March 8th;
• The cab took Montgomery and Heard to Ogle and Tincher’s apartment on Hill Avenue at Montgomery’s direction, [where] ... [b]oth Montgomery and Heard entered the apartment;
• Ogle was getting ready to go to work and Tincher, although she popped out to say hello, was still in bed;
• Ogle agreed to give Montgomery and Heard a ride to Montgomery’s mom’s apartment on Airport Road;
• Montgomery, sitting in the front seat, gave Ogle the directions and eventually told her to stop on the side of the road on Hill Avenue;
• Ogle and Montgomery got out of her car and walked roughly forty yards into a field or wooded area off Hill Avenue;
• Heard heard two gunshots [and] ... saw Ogle’s body laying on the ground;
*673 • Montgomery rushed back to Ogle’s car and motioned for Heard to get in the front passenger’s seat as Montgomery got into the driver’s seat ... [and] drove Ogle’s car back to the victims’ apartment complex;
• Montgomery picked a gun up off the floor of the car, exited the vehicle, and told Heard to take the car;
• Heard then left in the car and took Ogle’s wallet as he abandoned the car roughly one block from his home;
• A black person wearing a dark hooded jacket with the hood tied tight around her or his face left Tincher’s car the morning Tincher was found at Angola and Wenz Roads;
• On March [8]th, Montgomery, with Heard and [friends Eric Wilson and Sidney] Armstead, took the blue pin striped suit jacket he wore the night before to the cleaners;
• The gun Randleman put on top of the refrigerator was not there the next morning, March [8]th[,] [and] ... [a] bullet, consistent with the type that could be used in Montgomery’s gun which was identified as the murder weapon, was found in Tincher’s room in Tincher and Ogle’s apartment;
• Ogle’s car was found roughly one block from Heard’s home by police on March 9th[,] [and] ... Ogle’s wallet was found in Heard’s dresser drawer;
• A black hooded jacket and a semi automatic pistol manual were found in Montgomery’s mother’s apartment;
• Tincher died from a gunshot wound to the head, which entered from the right side (passenger side since Tincher was sitting in the driver’s seat of her car)[,] [and] ... Ogle died from a gunshot wound to the head;
• All the discharged bullets and casings at both scenes were fired from the .380 caliber semi automatic pistol that Montgomery’s mother gave police, which was the same gun Montgomery purchased just weeks earlier — the .380 caliber Bursa [sic] semi automatic pistol; and
• Montgomery led the police to the wooded area where Ogle’s body was discovered.
Montgomery, 482 F.Supp.2d at 927-28 (internal record citations omitted). Additionally, employees of One Hour Martinizing, the dry-cleaning business where Montgomery allegedly deposited the pin-striped suit jacket for cleaning, testified for the prosecution. State v. Montgomery, No. L-98-1026, 1999 WL 55852, at *2 (Ohio Ct.App. Feb. 5, 1999). Although they could not identify Montgomery, the dry-cleaning employees testified that on March 8, 1986, a black male brought in a soaking wet, dark blue pin-striped suit jacket to be cleaned in one hour. Id. The employees hung the jacket to dry, explaining that it would need to dry before it could be cleaned. Id. In her trial testimony, one employee remarked that the jacket was stained on both the outside and the lining, made a “brownish dripping mess on the floor,” and had to be cleaned three times with a chemical cleaner to remove the stains, which she could not identify. Id. Police later obtained the jacket, which Randleman identified as the one that he had loaned to Montgomery. Id.
In his defense, Montgomery’s counsel did not present any witnesses but rather attempted to raise reasonable doubt as to Montgomery’s guilt by cross-examining and impeaching the State’s witnesses. Defense counsel focused particularly on impeaching Heard’s testimony, which counsel described as “the crux of the state’s case.” First, the defense impeached Heard by demonstrating that he had pled guilty to complicity to murder and agreed to testify pursuant to a deal, under which the State dropped two aggravated murder charges *674 and a charge of gross sexual imposition involving a five-year old. Second, during the cross-examination of Detective Arthur M. Marx, the State’s chief investigative officer, defense counsel elicited testimony that Marx had told Heard that he could not have seen Ogle’s body from his position in the ear following the gunshots. Third, the defense emphasized during cross-examination that Heard had given the police various, conflicting accounts of the murders: (1) he contended that he knew nothing about the murders; (2) he implicated Montgomery as the killer; (3) he stated that he had observed a drug dealer driving Ogle’s car down an alley; and (4) he said that an unknown black male at a carwash mentioned that two white women had been killed. Fourth, the defense noted that, although Heard testified as to having heard two gunshots in connection with Ogle’s death, the coroner stated that Ogle’s body had three gunshot wounds. Finally, as to the robbery motive, Heard admitted during cross-examination that, due to the cold, he planned to take Ogle’s car regardless of Montgomery’s instructions to do so and that they had not discussed robbing anyone that night. Sergeant Przeslawski also testified that Ogle’s car was found behind an abandoned house near Heard’s home and that Ogle’s wallet was recovered from Heard’s dresser drawer.
Beyond impeaching Heard, defense counsel highlighted several additional flaws in the prosecution’s case. For example, defense counsel noted that none of the witnesses who saw the person fleeing the area where Tineher’s body was found could determine that person’s gender, nor could they ascertain the color of the hooded jacket. The defense also noted that Montgomery did not have a hooded jacket with him on the evening of March 7, 1986, and that Montgomery had money with him that night, thus calling into question his motive to steal Ogle’s car. Moreover, when leaving Randleman’s home, both Montgomery and Heard passed through the kitchen where the pistol that Randleman took from Montgomery was located. No fingerprints were found on either the murder weapon or on the cars belonging to Ogle and Tincher. Finally, notwithstanding other factual inconsistencies in his account of the murders, Montgomery consistently implicated Heard as the killer and stated that Heard had shown him the area where Heard had killed Ogle.
At the conclusion of the trial, the jury convicted Montgomery of the aggravated murder of Ogle, with the specifications that the murder involved the purposeful killing of two or more persons and that Montgomery was the principal offender while attempting to commit aggravated robbery. The jury also convicted Montgomery of the murder of Tincher. Following the mitigation phase, the jury recommended that Montgomery be sentenced to death, and the trial court concurred with this recommendation, ordering Montgomery’s execution.[1]
II.
After his conviction was upheld on direct appeal by the Ohio Supreme Court, Montgomery submitted seventy claims for post- *675 conviction relief in state court, which were denied after the State successfully sought summary judgment. The Ohio Court of Appeals reversed and remanded on the ground that the trial court failed to provide Montgomery an adequate opportunity to respond to the State’s motion. Although Montgomery was permitted to respond on remand, the trial court again denied his claims for relief, and the Ohio Court of Appeals affirmed this decision. In particular, the Ohio Court of Appeals rejected Montgomery’s fiftieth claim for relief, in which he argued that the State wrongfully withheld an exculpatory pretrial police report concerning Ogle, taken at a time when Ogle was still considered missing. See Montgomery, 1999 WL 55852, at *8. The police report, which indicated that it was taken on March 12, 1986, at 2:30 a.m., stated that David Ingram and several other witnesses — who were all high school classmates of Ogle — had seen her alive in her apartment complex parking lot at approximately 1:20 a.m. on March 12. The report read in pertinent part:
[Ingram] stated that he and several friends were at the Oak Hill apartments on Hill when they saw a Blue Ford Escort with Debbie Ogle driving around the complex. Later they again saw her as a passenger in the same auto. Debbie Ogle waved to them as they knew her from Rogers High School. She was with [a] white male with long side burns [sic]. She did not appear distressed.

Id.

The Ohio Court of Appeals rejected this claim, remarking that, although Ogle was considered missing at the time of Ingram’s report, “her car had been discovered abandoned behind a home several blocks from the home of the co-defendant Glover Heard.” Id. The court further stated that:
The lower court concluded that this isolated information, recorded in the course of an ongoing investigation when all of the facts were still being pieced together and in the face of overwhelming evidence presented at trial that Ogle had been killed on March 8, 1986, did not undermine confidence in the outcome of the trial. We agree and conclude that the trial court did not err in dismissing the fiftieth claim for relief.
Id. The Ohio Court of Appeals also rejected all other grounds for post-conviction relief, and the Ohio Supreme Court declined review of that decision.
Having exhausted his avenues for post-conviction relief in state court, Montgomery then filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Ohio, in which he alleged forty-eight grounds for relief. The district court reviewed each ground and eventually denied all of Montgomery’s claims except for the alleged Brady violation, which was premised upon the undisclosed police report. Montgomery, 482 F.Supp.2d at 1000-02. In evaluating the Brady claim, the district court concluded that the State had indeed suppressed the police report, which emerged six years after the trial and only pursuant to a Freedom of Information Act request by the defense for police records. Id. at 971. Moreover, the district court found the report exculpatory because the alleged sightings of Ogle on March 12, 1986, undermined the prosecution’s theory that she had been murdered on March 8 and could have impeached Heard’s testimony. Id. Finally, the district court determined that Montgomery suffered prejudice, opining “that the withheld police report could have undermined Heard’s testimony, which was the core of the State’s case.” Id. at 978. Thus, finding the report material under Brady, the district court issued a conditional "writ of habeas corpus on this basis. Id. at 1002.
*676 Following the issuance of the writ, a Toledo newspaper printed a story about the case, which noted that the district court’s decision was based upon the undisclosed police report. Upon hearing the news, three of the witnesses responsible for the report, including Ingram, called the Toledo Police Department to retract their earlier statements. They stated that the woman they had seen on March 12, 1986, was not Debra Ogle but rather was her younger sister, Dianna Ogle. After the witnesses signed sworn affidavits to this effect, the State filed the affidavits and a Rule 59(e) motion, requesting the district court to reconsider Montgomery’s writ on the basis of newly discovered evidence. The district court denied the Rule 59(e) motion, finding that the affidavits did not qualify as newly discovered evidence under Rule 59 and thus were not properly before the court.
III.
Because Montgomery filed his petition for a writ of habeas corpus after the effective date of the Antiterrorism and Effective Death Penalty Act (“AEDPA”), we review de novo the district court’s conclusions on issues of law and on mixed questions of law and fact and review its factual findings for clear error. Armstrong v. Morgan, 372 F.3d 778, 781 (6th Cir.2004). Pursuant to AEDPA, a federal court shall not grant a habeas petition with respect to any claim that was adjudicated on the merits in the state court unless the adjudication resulted in a decision that: (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented to the state courts. See 28 U.S.C. § 2254(d); Irick v. Bell, 565 F.3d 315, 319-20 (6th Cir.2009). “Under the ‘contrary to’ clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.” Williams v. Taylor, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Under the “unreasonable application” clause, a federal habeas court may grant the writ if the state court’s application of clearly established federal law to the facts of the prisoner’s case was objectively unreasonable. Id. at 409-11, 120 S.Ct. 1495.
The Supreme Court has made clear that § 2254(d), as amended by AED-PA, is a purposefully demanding standard. See Harrington v. Richter, — U.S. ——, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011) (“If [§ 2254(d) ] is difficult to meet, that is because it was meant to be.”). And, although § 2254(d) “reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems,” it does not function as a “substitute for ordinary error correction through appeal.” Id. (internal quotation marks omitted). Rather, to obtain relief, the state criminal defendant “must show that the state court’s ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.” Id. at 786-87. This “highly deferential standard for evaluating state-court rulings ... demands that state-court decisions be given the benefit of the doubt.” Cullen v. Pinholster, — U.S. -, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011) (internal citation and quotation marks omitted).
In construing the meaning of “unreasonable application” in § 2254(d)(1), the Court *677 has emphasized that “an unreasonable application of federal law is different from an incorrect application of federal law.” Williams, 529 U.S. at 410, 120 S.Ct. 1495; accord Harrington, 131 S.Ct. at 785; Renico v. Lett, — U.S. -, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010). Moreover, the Court has admonished that a reviewing court may not “treat[ ] the reasonableness question as a test of its confidence in the result it would reach under de novo review” and that “even a strong case for relief does not mean the state court’s contrary conclusion was unreasonable.” Harrington, 131 S.Ct. at 786; Renico, 130 S.Ct. at 1862 (stating that § 2254(d)(1) “creates ‘a substantially higher threshold’ for obtaining relief than de novo review” (quoting Schriro v. Landrigan, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007))). It is with these principles in mind that we review Montgomery’s claims.
A.
The State challenges the issuance of the writ of habeas corpus on three grounds: (1) that the police report was not material to the disposition of Montgomery’s trial because, even if he had been privy to the report, he cannot show a reasonable probability that the result of his trial would have been different; (2) that the district court did not properly defer to the state courts’ resolution of Montgomery’s Brady claim; and (3) that the police report is not evidence within the meaning of Brady. As to the first claim, the Ohio Court of Appeals determined that the undisclosed police report was not material to Montgomery’s guilt or innocence because, “in face of [the] overwhelming evidence presented at trial that Ogle had been killed on March 8, 1986,” the report did not undermine confidence in the outcome of the trial. Montgomery, 1999 WL 55852, at *8. This decision, the State argues, neither contravened nor unreasonably applied clearly established federal law. In reply, Montgomery contends that habeas was properly granted because the State withheld an exculpatory police report, and Montgomery suffered prejudice.
Although Montgomery argues that the district court “correctly conducted a de novo review of the [Brady] claim,” in a habeas case, as here, review by the federal courts is limited. In this case, the State maintains that “[i]t is undisputable that the Ohio Court of Appeals applied the proper constitutional standards” and that “there [do] not appear to be any cases in which the Supreme Court has ... reached a different result based on materially indistinguishable facts.” Montgomery does not challenge this argument. Nor do the parties contend that the state court’s decision was based upon an unreasonable determination of the facts in light of the evidence. Thus, under AEDPA, our review of the state court’s decision is limited to whether the Ohio Court of Appeals unreasonably applied Brady to the facts of Montgomery’s case. See Williams, 529 U.S. at 413, 120 S.Ct. 1495 (“Under the ‘unreasonable application’ clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle ... but unreasonably applies that principle to the facts of the prisoner’s case.”). We conclude that the Ohio Court of Appeals did not unreasonably apply Brady when it rejected Montgomery’s claim based upon the undisclosed police report.[2]
*678 In Brady, the Supreme Court held that a criminal defendant’s due process rights are violated if the prosecution suppresses exculpatory evidence that is material to the defendant’s guilt or punishment. 373 U.S. at 87, 83 S.Ct. 1194; Strickler v. Greene, 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). The law in Brady applies regardless of whether the defendant has expressly requested such evidence and encompasses both exculpatory and impeachment evidence. Strickler, 527 U.S. at 280, 119 S.Ct. 1936 (internal citations omitted). In this respect, the Brady due process rule complements the criminal defendant’s Sixth Amendment right to a trial by an impartial jury and preserves the criminal trial as “the chosen forum for ascertaining the truth about criminal accusations.” Kyles v. Whitley, 514 U.S. 419, 440, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).
In order to establish a violation of Brady, Montgomery must show that the following three requirements are met: “The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.” Strickler, 527 U.S. at 281-82, 119 S.Ct. 1936. In terms of the first requirement, the pretrial police report — which indicated that several witnesses had seen one of Montgomery’s alleged victims alive four days after the State argued that he killed her — is favorable to Montgomery because it casts doubt on the State’s theory of the case. As for the second requirement, it is undisputed that this pretrial police report was suppressed by the State. Indeed, Montgomery was not aware of it until six years after his trial, when it was disclosed pursuant to a formal request for police records. In terms of the third requirement for a Brady violation, however, the parties dispute whether Montgomery “has established the prejudice necessary to satisfy the ‘materiality’ inquiry.” Id. at 282, 119 S.Ct. 1936.
“Prejudice (or materiality) in the Brady context is a difficult test to meet....” Jamison v. Collins, 291 F.3d 380, 388 (6th Cir.2002). In order to establish prejudice, “the nondisclosure [must be] so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.” Strickler, 527 U.S. at 281, 119 S.Ct. 1936. But, the Brady standard is not met if the petitioner shows merely a reasonable possibility that the suppressed evidence might have produced a different outcome; rather, a reasonable probability is required.[3] Id. at 291, 119 S.Ct. 1936 (stating that “[t]he District Court was surely correct that there is a reasonable possibility that either a total, or just a substantial, discount of [the witness’s] testimony might have produced a different result” but that “petitioner’s burden is to establish a reasonable probability of a different result” (citing Kyles, 514 U.S. at 434, 115 S.Ct. 1555)); see also United States v. Agurs, 427 U.S. 97, 109-10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (“The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does *679 not establish ‘materiality’ in the constitutional sense.”). “A reasonable probability is a ‘probability sufficient to undermine confidence in the outcome.’ ” Wilson v. Parker, 515 F.3d 682, 701-02 (6th Cir. 2008) (quoting United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)); see also Cone v. Bell, 556 U.S. 449, 129 S.Ct. 1769, 1783, 173 L.Ed.2d 701 (2009).
In Kyles, the Supreme Court elaborated upon the materiality standard set forth in Brady and its progeny. 514 U.S. at 434-38, 115 S.Ct. 1555. There, the Court explained that Brady materiality “is not a sufficiency of evidence test.” Id. at 434, 115 S.Ct. 1555. Nor does Brady “require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant’s acquittal.” Id. Ultimately, “[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.” Id. “In making this determination, we review the evidence ‘collectively, not item by item.’ ” Brooks v. Tenn., 626 F.3d 878, 892 (6th Cir.2010) (quoting Kyles, 514 U.S. at 436, 115 S.Ct. 1555). And, this circuit has repeatedly acknowledged that “[e]vidence that is merely cumulative to evidence presented at trial is not material for purposes of Brady analysis.” Id. at 893 (internal quotation marks omitted).
The Supreme Court has also recently clarified the obligation of a reviewing court to consider the totality of the evidence— and not merely exculpatory facts in isolation — when evaluating a claim of error for its prejudicial effect. In Wong v. Belmontes, the Supreme Court stated:
In evaluating th[e] question [of prejudice], it is necessary to consider all the relevant evidence that the jury would have had before it if [the defense] had pursued [a] different path — not just the mitigation evidence [the defense] could have presented, but also the [other] evidence that almost certainly would have come in with it.
— U.S. -, 130 S.Ct. 383, 386, 175 L.Ed.2d 328 (2009).[4] On the facts of Wong, the defense counsel’s failure to introduce certain favorable evidence was not prejudicial to Belmontes because the introduction of that favorable evidence would have “opened the door” to unfavorable evidence, which ultimately outweighed the favorable. Id. at 388-89. Likewise, in Bobby v. Van Hook, — U.S. -, 130 S.Ct. 13, 20, 175 L.Ed.2d 255 (2009), the Court stated that a reviewing court, when consid *680 ering a defendant’s claim of prejudice, must evaluate the weight of mitigating and aggravating evidence regarding the defendant’s guilt, rather than simply tallying instances of mitigation. Guided by these principles, we must determine whether the Ohio Court of Appeals unreasonably applied Brady and its progeny in concluding that the undisclosed police report was not material to the outcome of Montgomery’s trial.
Montgomery argues that consideration of the content of the police report undermines confidence in his conviction. The evidence at trial, however, strongly implicated Montgomery as the triggerman in the deaths of Ogle and Tincher. First, both victims were shot with a .380-caliber pistol that Montgomery bought approximately two weeks before their deaths. Second, Montgomery’s uncle saw Montgomery drunk and in possession of the murder weapon only a few hours before Tincher was found shot dead approximately one-half of a mile from Montgomery’s home on March 8. Third, Montgomery admitted to being at Ogle and Tincher’s apartment on March 8, and it is undisputed that Ogle was reported missing sometime shortly after Montgomery’s acknowledged visit. Fourth, Montgomery was wearing a dark blue pin-striped suit jacket during the night in question, and a few hours after Tincher was found dead and Ogle disappeared, Montgomery took a dark blue pin-striped suit to the dry cleaners that was soaking wet and that made a “brownish dripping mess on the floor” as it dried. Fifth, Heard testified that he was with Montgomery and witnessed Montgomery shoot Ogle. Sixth, on the evening of March 12, Montgomery’s mother delivered the murder weapon to Officer Marx at a nearby Way-Lo gas station. Finally, Montgomery showed police officers where Ogle’s body was located on March 12.
Given this strong evidence that Montgomery shot Tincher and Ogle, the question is whether the Ohio Court of Appeals unreasonably applied Brady in its determination that the withheld police report is not material. The Ohio court found that the vague police report does not undermine confidence in Montgomery’s conviction. The police report stated that in the early morning of March 12, David Ingram and several friends “saw a Blue Ford Escort with Debbie Ogle driving around.... Later they again saw her as a passenger in [the] same auto. Debbie Ogle waved to them as they knew her from Rogers High School. She was with [a] white male with long side burns. She did not appear distressed.” Viewed alone, this police report could cast doubt on the State’s theory that Montgomery killed Ogle on March 8. However, when viewed — as Wong directs — in the context of all the evidence, including the evidence supporting the State’s theory that Montgomery did kill Ogle, the Ohio court was clearly not unreasonable in its determination that the report’s nondisclosure does not undermine confidence in the verdict.
It is true, as the dissent notes, that some evidence at trial also tended to implicate Heard. Montgomery and Heard were together on the evening of March 8, and both men visited Ogle and Tincher’s apartment. Ogle’s wallet was later found in Heard’s house, and her abandoned car was recovered nearby. And, Heard’s multiple accounts of the murders certainly undermined the credibility of his testimony. The jury was aware of all of this. Although the dissent contends that the undisclosed police report might have tipped the balance in Montgomery’s favor by “undermining the strength of an already shaky verdict,” we are not persuaded that the report was material to the relevant issue at trial: whether Montgomery or Heard was the triggerman. To the contrary, the report *681 exonerates Heard as Ogle’s shooter because he was imprisoned by the time of the alleged sighting on March 12.
In reaching our conclusion that the report was not material under Brady, it is worth emphasizing several points. Foremost, Montgomery led police to Ogle’s body the same day of the alleged sighting described in the police report. At noon on March 12, Montgomery voluntarily sought out the police and admitted to them that both Tincher and Ogle had been killed with his gun, though he stated that Heard had shot them. In other words, mere hours after the alleged sighting of Ogle, Montgomery had already confessed to the police that he had been involved in their murders and that they had been killed with his gun. Moreover, although Montgomery maintained that Heard was the triggerman with respect to both victims, Montgomery’s account of events, given to the police on March 12 — after the alleged sighting of Ogle but before her body was found — placed the murder weapon in his hands on the morning of March 8. Finally, the report does not suggest a plausible alternative theory of the case.[5]
Notwithstanding the considerable evidence of his guilt, Montgomery argues that the police report was material to his case under Brady. In asserting prejudice, he accords great weight to the argument that the police report could have impeached Heard’s testimony and therefore undermined the State’s theory of the case. However, with respect to impeachment,
this Court has previously remarked: “[Wjhere the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material.” Byrd v. Collins, 209 F.3d 486, 518 (6th Cir.2000) (quoting United States v. Avellino, 136 F.3d 249, 257 (2d Cir. 1998)). In Bell v. Bell, for example, we concluded that an informant-witness was sufficiently impeached, and that undisclosed impeachment materials concerning a meeting between that witness and a prosecutor were nonmaterial for Brady purposes, where “[t]he jury was apprised of [the informant-witness’s] status and the possible other reasons for his decision to testify, namely, that he wished to secure early parole as a result of his participation in the ... case.” 512 F.3d 223, 237 (6th Cir.2008) (en bane). Likewise, in Brooks, we found that an “[informant-witness’s] credibility was effectively impeached at trial” through evidence that the witness “had an extensive criminal history,” was a “professional snitch,” and had “received benefits from snitching.” 626 F.3d at 893-94. We therefore determined that undisclosed “[e]vidence of his history of mental illness would have provided additional reasons not to credit his testimony, but would have been cumulative to the evidence already in the record.” Id. at 894; see also Doan v. *682 Carter, 548 F.3d 449, 460 (6th Cir.2008) (stating that, “[e]ven if ... evidence was wrongly withheld by the prosecution,” this evidence was cumulative for the purpose of discrediting a witness “because [the witness] had already been impeached on his extensive criminal record and drug problems”).
Here, as in Bell and Brooks, Heard’s testimony was amply impeached at trial, during his cross-examination and through the cross-examination of other witnesses, such as Officer Marx. As to Heard’s potential motive in testifying, defense counsel emphasized that Heard initially had been charged in the murders of Tincher and Ogle but had pled guilty to complicity to murder and was required to testify against Montgomery pursuant to his plea bargain. Thus, the jury was aware that Heard’s testimony had been procured for his own substantial benefit, namely, the opportunity to plead guilty to a lesser charge and receive a concomitantly lower sentence. And, the jury was aware of Heard’s significant motive to implicate Montgomery as the triggerman.
At trial, witness testimony also linked Heard to physical evidence in the case: Sergeant Przeslawski testified that Ogle’s wallet was found within Heard’s dresser drawer and that her car was found near his home. Officer Marx testified that, contrary to Heard’s account of Ogle’s murder, Heard could not have seen Ogle’s body in the field where Montgomery allegedly shot her based upon Heard’s position inside the vehicle. Finally, defense counsel highlighted Heard’s multiple accounts of the murder, calling into question Heard’s credibility. The jury was therefore apprised of Heard’s motive, his relationship to the physical evidence, and the potential incredibility of his testimony. Given this extensive impeachment of Heard’s account of the murders, the police report is cumulative evidence to the extent that it would further cast doubt upon Heard’s testimony. See Bell, 512 F.3d at 237.[6]
Furthermore, Montgomery ignores the likely damaging evidence flowing from the report. Most significantly, the report that several witnesses observed Ogle alive at approximately 1:20 a.m. on March 12 undermines the defense theory that Heard, the State’s primary witness, was the triggerman. Because it is undisputed that Heard was in custody by March 11, Montgomery’s theory is plausible only if Ogle was killed before Heard’s arrest. To the contrary, evidence that Ogle was alive on March 12 would remove all suspicion from Heard regarding Ogle’s death, destroying Montgomery’s defense theory.
It is similarly undisputed that Montgomery’s mother, Caroline Jones, telephoned the police station on the afternoon of March 12; arranged to meet Officer Marx at a Way-Lo gas station for the purpose of delivering Montgomery’s .380-caliber semi-automatic pistol; and did, in fact, deliver the pistol — which was later confirmed to be the murder weapon — to Officer Marx *683 at approximately 6 p.m. Thus, if Ogle was alive at 1:20 a.m. on March 12, Montgomery must necessarily contend that someone other than Heard had possession of his gun; killed Ogle on March 12 between the hours of 1:20 a.m. and noon, the time at which Montgomery was arrested and stated that Heard killed both women; showed Montgomery the location of Ogle’s body before his noontime arrest; and returned the weapon to Montgomery’s mother before 6 p.m. Yet, this time line entirely subverts Montgomery’s defense theory that Heard was the killer. The defense did not mention any other potential suspects and never suggested that anyone other than Heard possessed Montgomery’s .380-caliber pistol.
Montgomery also ignores the fact that any witnesses who testified on his behalf regarding the alleged March 12 sighting of Ogle would have been subject to cross-examination, during which the State could have raised factual contradictions, namely: that Ogle had been reported missing and was the subject of a search since March 8; that her car had been found abandoned on March 9; that her wallet had been recovered from Heard’s dresser drawer; and that both Montgomery and Heard had told the police that Ogle had been murdered on March 8. Moreover, the State quite likely could have successfully obtained the witnesses’ admissions that they had in fact been mistaken about the sighting of Ogle and had instead seen her sister.[7]
Nevertheless, in a final attempt to demonstrate the materiality of the police report, Montgomery directs our attention to the coroner’s autopsy report, which lists March 12, 1986, as the date of Ogle’s death. However, this date appears to be based merely upon the fact that Ogle’s body was found — and thus officially pronounced dead — on March 12, while from March 8 until this date she was officially considered missing. Indeed, although the coroner’s verdict report notes that Ogle’s body was found on March 12, 1986, it also lists March 8, 1986, as the date of the homicide and gunshot wounds. Thus, coupled with evidence indicating that Ogle was missing from March 8, the coroner’s autopsy report neither bolsters Montgomery’s argument nor establishes the materiality of the police report with respect to his Brady claim.
In reaching our decision, we emphasize that “saying that a particular nondisclosure was not a Brady violation in no way suggests that the prosecutor did not have a duty to disclose the information.” Bell, 512 F.3d at 235 n. 7. But, when Montgomery’s case is considered both in light of recent Supreme Court precedent in Wong and Van Hook, and with respect to the totality of the evidence, the State’s failure to disclose the police report does not amount to constitutional error because Montgomery has not shown that the evidence would have created a reasonable probability of a different result at either the guilt phase of trial or at sentencing. See id. at 236. Consequently, the Ohio courts did not unreasonably apply clearly established federal law by denying Montgomery’s Brady claim.
B.
Montgomery also appeals the denial of habeas relief on the following two grounds: (1) whether the trial court should have disqualified a juror who advised the court that she had been a psychiatric patient and *684 that she had seen the defense psychiatrist in a dream twenty years earlier in which he appeared as the devil; and (2) whether the court should have ordered a change of venue on account of pretrial publicity. As to these claims, we agree with the district court’s reasoning and conclude that the state court neither contravened nor unreasonably applied clearly established federal law in denying Montgomery’s requested relief.
1.
First, Montgomery claims that a juror’s note to the court disclosing her previous psychiatric treatment and describing her dream about the defense psychiatrist, in which the psychiatrist resembled the devil, demonstrates that she was biased, irrational, and incompetent. He claims that the trial judge erroneously failed to excuse this juror, thereby violating his Sixth Amendment right to a fair trial by an impartial jury. When presented with an allegation of bias, the question is “did a juror swear that [s]he could set aside any opinion [s]he might hold and decide the ease on the evidence, and should the juror’s protestation of impartiality have been believed.” Williams v. Bagley, 380 F.3d 932, 944 (6th Cir.2004) (quoting Patton v. Yount, 467 U.S. 1025, 1036, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984)). “A trial court’s finding of impartiality is a factual determination entitled to 28 U.S.C. § 2254(e)’s presumption of correctness, and may be overturned only for manifest error.” Id. (internal citations and quotation marks omitted).
After receiving the note from the juror, the trial judge questioned the juror about her impartiality and competence, and the following colloquy ensued:
The Court: Okay. Just let me ask you, would ... the matter that you have reported to me in the note ... affect your consideration of the case in such a way ... that you could not be fair and impartial?
[Juror]: No, not when you use the word effect.
The Court: Would it have any effect? [Juror]: No because ... this is in the past, 20 years ago this [dream] happened.
The Court: Okay. Then would ... what you have reported to me in this note have any effect on your consideration of the matter that is before the jury now? [Juror]: No, no.
The Court: Okay, very good. You’ll be taken back to the jury room, then, and the jurors will be instructed to proceed with their deliberations.
As reflected in this dialogue, the trial judge retained the juror only after she reassured him that she could distinguish between her dream and reality, set aside her dream during deliberations, and determine the case solely based on the evidence at trial. We therefore conclude that the trial judge acted appropriately and that Montgomery has failed to offer clear and convincing evidence that the juror could not or did not remain impartial.
2.
As for the second claim, Montgomery contends that the trial court’s denial of his motion to change venue violated his constitutional right to a fair trial in light of extensive pretrial publicity. However, although this case did involve pretrial publicity, the relevant question in a challenge to the trial court’s decision not to change venue is whether the jurors “could not judge impartially the guilt of the defendant.” Patton v. Yount, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). The Supreme Court has stated that a “trial court’s findings of juror im *685 partiality may be overturned only for manifest error.” Mu’Min v. Virginia, 500 U.S. 415, 428, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991) (internal citations and quotation marks omitted). Although Montgomery has presented evidence that jurors were exposed to pretrial media coverage, he has neither argued nor demonstrated that there was a “pattern of deep and bitter prejudice shown to be present throughout the community,” Irvin v. Dowd, 366 U.S. 717, 727, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (internal citations and quotation marks omitted), such that the trial court’s findings of impartiality were manifest error. Accordingly, the trial court did not unreasonably apply clearly established federal law in refusing to grant Montgomery’s motion to change venue.
C.
In his final argument, Montgomery seeks to expand his Certificate of Appealability (“COA”) to include an additional Brady claim premised upon the State’s alleged withholding of a plea bargain with informant Michael Clark in exchange for his testimony against Montgomery and Heard, and upon the State’s subsequent decision not to call Clark as a witness. As described above, the police were first alerted to Heard and Montgomery through a Crime Stoppers tip in which inmate Clark stated that he had received a telephone call from Heard, who reported having seen the murders of two women. However, Montgomery did not assert a Brady violation based on withholding this plea information in his habeas petition in the district court; rather, he argued that the State suppressed evidence that there was no telephone call between Heard and Clark because the telephone was not turned on at the alleged time of the call. See Montgomery, 482 F.Supp.2d at 974-75. The district court rejected the telephone claim as meritless, finding that there was no evidence as to whether the prison phone was turned on, that the phone was typically on by 9 a.m. on weekends, and that several witnesses stated that Clark had confirmed the call. Id. The district court also denied a COA as to the telephone claim because it was not debatable among jurists of reason, as it did not “come[ ] close to presenting a federal constitutional or legal violation.” Id. at 1002.
Because Montgomery did not assert a Brady claim premised upon the State’s plea bargain with Clark in the district court, we do not reach the merits of his request for an expanded COA. His claim is not properly before this court. Indeed, “[i]t is a well-established principle of appellate review that appellate courts do not address claims not properly presented below.” Chandler v. Jones, 813 F.2d 773, 777 (6th Cir.1987) (collecting cases); see also Seymour v. Walker, 224 F.3d 542, 561 (6th Cir.2000) (“Although [petitioner] raised these claims in her state postconviction proceeding, she did not raise them before the district court in the present habeas petition, and no certificate of appealability was issued with respect to them. Therefore, we may not consider them.”).
IV.
For the foregoing reasons, we reverse the district court’s grant of the writ of habeas corpus to Montgomery on the basis of a Brady violation and affirm the district court in all other respects.

. The dissent challenges the majority’s recitation of the factual record and accuses the majority of "glossing over the veracity and credibility problems affecting several pieces of inculpatory evidence.” From there, the dissent undertakes a de novo review of the record, citing its obligation to "grapple with a case’s relevant facts as found by the state court.” We have reviewed the record with due deference to the state court and reject the dissent’s approach of reweighing evidence that was presented to and considered by the jury — an approach that is not in accord with AEDPA's constraints.

. Because we conclude that Montgomery was not entitled to the writ of habeas corpus on the basis of the alleged Brady violation, we need not, and therefore do not, address the State's remaining two issues.

. The dissent faults the majority for "contrasting] ‘probability’ with ‘possibility’ ’’ and suggests that this comparison "tacitly chang[es] the meaning of the word ‘probability’ in the materiality context to require a likelihood of a different result for Brady materiality.” As an appellate court, however, our interpretation of Brady's requirements is — as it must be — guided by Supreme Court precedent. In citing Strickler, we have merely noted a distinction drawn by the Court and have not set forth a modified version of Brady’s reasonable probability standard.

. Although Wong is a case about Strickland prejudice, it is well settled that “the test for prejudice under Brady and Strickland is the same. Avila v. Quarterman, 560 F.3d 299, 314 (5th Cir.2009) (internal quotation marks omitted); see also Jennings v. McDonough, 490 F.3d 1230, 1243 (11th Cir.2007); Snow v. Sirmons, 474 F.3d 693, 725 n. 34 (10th Cir. 2007); Joseph v. Coyle, 469 F.3d 441, 462 n. 16 (6th Cir.2006); Clay v. Bowersox, 367 F.3d 993, 1000 (8th Cir.2004). The Supreme Court in Strickland acknowledged this, stating that "the appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution.” 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (citing Agurs, 427 U.S. at 104, 96 S.Ct. 2392); see also Kyles, 514 U.S. at 436, 115 S.Ct. 1555 (noting that the standard for assessing materiality in the context of Agurs and Brady was “later adopted as the test for prejudice in Strickland ”). Nevertheless, citing Strickland 's deficient-performance prong, the dissent maintains that we have erroneously imported the presumption of reasonableness that applies to claims asserting ineffective assistance of counsel. We have not done so. We have not suggested that Brady’s materiality requirement mirrors the analysis of deficient performance under Strickland.

. The report does not, for example, suggest that a third party beyond the primary suspects, Montgomery and Heard, committed the crime. Nor does it offer an alternative explanation as to how the murder weapon ultimately ended up in Montgomery’s hands. Nevertheless, the dissent suggests without elaboration that "the report sheds light on additional potential defense theories that could have been available to Petitioner.” Under Brady, however, we must ask whether the undisclosed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.” Kyles, 514 U.S. at 435, 115 S.Ct. 1555. Here, the evidence pointed to only two suspects, Montgomery and Heard, and Montgomery consistently implicated Heard in his statements to the police. We therefore find that the report did not undermine confidence in the verdict based upon an undescribed "additional potential defense theorly].”

. The dissent maintains that the police report was not cumulative for the purpose of impeaching Heard’s testimony because it "presents entirely new information, factually unrelated to any of the evidence available to [Montgomery] at the time of his trial.” This argument is beside the point. In Brooks, we found evidence of an informant-witness's history of mental illness nonmaterial under Brady — even though it presented factually new information — because that witness had been "effectively impeached at trial.” 626 F.3d at 894. Here, evidence that Ogle was potentially alive on the morning of March 12 could have provided an additional reason to discredit Heard’s testimony by undercutting his account of the murders. But, for the reasons we have stated, Heard's credibility as to the facts was already severely undermined by his own multiple accounts of the murders. Thus, the report is cumulative to the extent it further impeaches Heard’s credibility.

. Although the affidavits attesting that the witnesses actually saw Ogle's sister were not signed until six years after trial, the witnesses had no reason to come forward until the news account about the report appeared. Nothing suggests that they did not recognize their error sooner or would not have recognized it if questioned.