NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0137n.06

No. 14-2035

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Mar 11, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| KEVIN LLOYD ARTZ, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| PAUL KLEE, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

Before: SUTTON and KETHLEDGE, Circuit Judges; BECKWITH District Judge.[*]

KETHLEDGE, Circuit Judge.   In 2001, a Michigan jury convicted Kevin Artz of murdering his wife Patty.  The trial court sentenced him to life in prison without the possibility of parole.  He now seeks a writ of habeas corpus, arguing that the prosecution withheld an exculpatory opinion from a neuropsychologist who examined Artz.  He also argues that his trial counsel was constitutionally ineffective for failing to elicit trial testimony from a priest who spoke to Artz shortly after his arrest for the murder.  The district court denied Artz's petition.  We affirm.

---

[*] The Honorable Sandra S. Beckwith, United States District Judge for the Southern District of Ohio, sitting by designation.

I.

A.

In June 1999, Artz had surgery to repair a brain hemorrhage. Two days later, he was released from the hospital and into Patty's care. Two weeks later, he hit Patty on the head with a metal bar, killing her in the living room of their apartment in Jackson, Michigan. Artz put her body in a sleeping bag and dragged it to an adjacent restaurant that they jointly owned. Artz tried to clean up the blood in the living room and rearranged furniture to cover the blood spots that he could not clean. During the next two days, he dismembered Patty's body and—using the restaurant kitchen—baked, boiled, or broiled her remains.

Meanwhile, Patty's relatives tried to contact her. After two days with no response, her sisters and Artz's father went to the restaurant and knocked on its doors and windows. At one point, Artz stepped out and told the family that Patty had taken the Artzes' car to visit someone. According to Patty's sister, however, the Artzes had sold the car a day or two earlier.

Patty's sisters called the police. Deputy Sheriff Wayne Bisard was the first to respond. With Artz's permission, Bisard looked inside the restaurant. He saw no signs of Patty, but grew suspicious after asking Artz when he had last seen her. Bisard left to consult with his supervisor, and later returned with Detective Thomas Fiero. Bisard and Fiero spotted Artz walking around a corner with a white box. A few minutes later, Artz returned to the restaurant without the box. Artz then let the officers back into the restaurant. Once inside, the officers saw drippings that resembled blood on newspapers by the oven, and a pan of cooked material in the sink. Fiero recognized the smell of burnt flesh. Police retrieved the white box from the porch of a vacant house nearby. The box contained Patty's remains. Artz was arrested and charged with first-

degree murder.  *See People v. Artz*, No. 233471, 2003 WL 1950239, at \*1-3 (Mich. Ct. App. Apr. 24, 2003).

B.

At trial, Artz's counsel, Joseph Filip, did not dispute that Artz killed Patty.  Rather, Filip argued that Artz was not guilty by reason of insanity because of either his brain hemorrhage or his surgery to repair the hemorrhage.  Two psychological experts who examined Artz testified about his version of events:  according to Artz, on the night of the murder he had fallen asleep in the living room.  Patty woke him up, at which point he hallucinated, thinking that she was the devil, and struck her with the closest object he could find, which happened to be a metal bar.  Only after killing her, Artz said, did he realize that he had struck his wife.

The neurosurgeon who performed Artz's surgery, Dr. Harish Rawal, testified that Artz's brain bleed was "not acute" and that the surgery to fix it had been simple.  Rawal also testified that he had not seen any abnormality in Artz's brain after the surgery.  Rawal did say that Artz had difficulty finding words to express his thoughts after the surgery, but that he showed no defects in his thought process.

Artz presented testimony from two neuropsychologists, Drs. Edward Cook and Bradley Sewick.  Cook testified that Artz had an "organic, psychotic condition" both before and after his brain surgery, and thus lacked the capacity to understand the wrongfulness of his conduct.  Cook also testified that Artz had thought Patty was the devil when he killed her.  Sewick testified that Artz's brain injury was severe and affected his ability to think rationally.  Sewick noted that Artz had a history of marijuana use, but explained that he did not think marijuana contributed significantly to Artz's mental illness.  Sewick opined that Artz was delirious and psychotic when he killed Patty and therefore could not appreciate the wrongfulness of his actions.

The prosecution called several rebuttal witnesses, including forensic psychologist Charles Clark. Earlier in the proceedings, the court had appointed Clark to evaluate Artz for criminal responsibility. Based on that evaluation, Clark testified that none of the psychological tests he had administered to Artz indicated any psychopathology, such as delusions, hallucinations, or psychosis. Clark testified that Artz had no history of mental illness before the murder, and that Artz's records showed no signs of mental illness after the murder. Clark opined that Artz was not legally insane when Artz killed Patty and that he could appreciate the wrongfulness of his actions.

The prosecution also called Dr. Moses Muzquiz, a cardiologist and angioligist (a physician who specializes in diseases that affect the circulatory system, including blood vessels in the brain). Muzquiz testified that he did not see signs of permanent brain damage as a result of Artz's brain bleed. Musquiz also testified that Artz's brain bleed did not affect the areas of the brain associated with cognition and judgment.

The prosecution's most extensive rebuttal testimony came from Dr. Joseph Galdi, a neuropsychologist at the Michigan Department of Health and Human Services' Center for Forensic Psychiatry. (Artz stayed at the Center five months for a court-ordered evaluation before trial.) The Center is a state-run facility that evaluates criminal defendants for both criminal responsibility and competency to stand trial. R. 18 at 8. The Center provides impartial evaluations and works directly for the courts; all of its patients are referred by court order. *Id.* at 33-35. Galdi interviewed Artz and 43 other witnesses before preparing a 77-page report, which he submitted to both the prosecution and the defense. According to Galdi, Artz's personality tests did not show any signs of psychotic or paranoid thinking. Nor did Artz show any signs of hallucinations, paranoia, or psychosis during his time at the Center. Galdi testified that Artz did

not describe Patty as a "demon" or "devil" until several weeks after the murder. Galdi ultimately concluded that Artz was not suffering from a mental illness when he killed his wife.

The jury rejected Artz's insanity defense and found him guilty of first-degree murder. The trial court sentenced him to life imprisonment without the possibility of parole. The Michigan Court of Appeals affirmed his conviction, and the Michigan Supreme Court denied leave to appeal. *See Artz*, 2003 WL 1950239; *People v. Artz*, 671 N.W.2d 47 (Mich. 2003). Artz then moved for relief from judgment, arguing among other things that Filip was ineffective for failing to call several lay and expert witnesses. The trial court denied relief because Artz had procedurally defaulted his claims by not raising them on direct appeal. The state appellate courts denied leave to appeal. *See People v. Artz*, 707 N.W.2d 193 (Mich. 2005).

Artz thereafter petitioned for federal habeas relief on the same grounds that he had raised in his state post-conviction proceedings. While Artz's petition was pending, Galdi wrote a letter to the district court asserting (allegedly for the first time) that, at the time of the murder, Artz was likely suffering from "marijuana-induced psychosis." Galdi continued to believe, however, that Artz was not legally insane at that time. The district court held Artz's petition in abeyance while Artz returned to state court to exhaust a *Brady* claim based on Dr. Galdi's letter. The state trial court held an evidentiary hearing, but ultimately denied relief because Artz had procedurally defaulted the claim by not raising it on direct appeal or in his previous petition for relief from judgment. The Michigan appellate courts denied leave to appeal. *See People v. Artz*, 783 N.W.2d 332 (Mich. 2010).

Artz returned to federal court and added his newly-exhausted *Brady* claim to his petition. In a thorough report, a magistrate judge recommended that the district court deny the writ. The district court adopted the recommendation. This appeal followed.

II.

We review de novo a district court's denial of habeas relief. *See Babick v. Berghuis*, 620 F.3d 571, 576 (6th Cir. 2010). Artz raises two claims on appeal: a *Brady* claim related to the alleged suppression of Dr. Galdi's opinion that Artz suffered from "marijuana-induced psychosis," and a claim that Filip was ineffective for failing to call a priest to testify about a conversation between Artz and the priest shortly after the murder. The Michigan courts found that Artz had procedurally defaulted both claims. Thus, in order to obtain federal habeas relief, he must establish cause and prejudice to excuse the defaults and then show that the claims are meritorious. *Id.*

A

Artz argues that the prosecution violated his due-process rights when Galdi omitted the word "psychosis" from his report and trial testimony. *See Brady v. Maryland*, 373 U.S. 83, 87-88 (1963). To prevail on his claim, Artz must prove "that the Government suppressed evidence, that such evidence was favorable to the defense, and that the suppressed evidence was material." *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). The suppression and materiality elements of a *Brady* claim mirror the cause and prejudice elements of the procedural-default analysis. *Brooks v. Tennessee*, 626 F.3d 878, 890-91 (6th Cir. 2010). Thus, if Artz establishes the elements of his *Brady* claim, then he will also establish cause and prejudice to excuse his procedural default of the claim. *Id.*

Here, we cut to the question whether the alleged omission was material. Artz contends that it was because, in his view, Filip could have use Galdi's allegedly suppressed opinion—that

Artz was suffering from a marijuana-induced psychosis at the time of the murder—to bolster Artz's insanity defense. But there are good reasons to think that the omission of that opinion made no difference at Artz's trial. The first is that Filip himself testified that he would not have used the opinion if he had gotten it then. *See* R. 44-7 at 13-14. The second, relatedly, is that Galdi's putative "marijuana-induced psychosis" opinion would have conflicted with Filip's strategy at trial. That strategy was to argue that, at the time of the killing, Artz was psychotic because of his brain injury—which is what Artz's experts told the jury at trial. Meanwhile, the prosecution argued at trial that Artz killed Patty because she objected to his marijuana habit, particularly in the days right after his surgery. *See* R. 17 at 35-49. For that reason, Filip affirmatively did not want to concede that Artz smoked marijuana after his surgery. Nobody questions the reasonableness of that strategy here. Moreover, notwithstanding Galdi's use of the term "psychosis," Galdi opined at trial (and continues to believe now, per his later testimony) that Artz was not legally insane when he murdered Patty. Thus, Galdi's putative "marijuana-induced psychosis" opinion would have undermined Filip's quite reasonable trial strategy and the testimony of his own experts, while ratifying the premises of the prosecution's strategy. Artz has not shown a "reasonable probability," *Montgomery v. Bobby*, 654 F.3d 668, 678 (6th Cir. 2011) (en banc), that Galdi's marijuana-induced psychosis opinion would have changed the result at Artz's trial. His claim therefore fails.

B.

Artz also argues that Filip was constitutionally ineffective because at trial he should have called as a witness Father Shaver, a priest who spoke to Artz in jail a few days after the murder. To prevail on that claim, Artz must show that Filip's decision not to call Shaver "fell below an objective standard of reasonableness" and resulted in prejudice to Artz at trial. *Strickland v.*

*Washington*, 466 U.S. 668, 688, 694 (1984). Counsel's performance is prejudicial if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

Artz satisfies neither prong here. According to Artz, Shaver would have testified that, when Artz confessed to the murder to Shaver, Artz had said, "I didn't know it was Patty." R. 1-1 at 13-15. According to Artz, his use of "it" reflects an "obvious hallucination" that would have strengthened his insanity defense. Artz's Br. at 55. We do not think the point is so obvious. Shaver's testimony at a state-court hearing was vague on this point: during Artz's confession, Shaver said, Artz "described being asleep, being jolted, being terrified, and striking out with an object that was near to him." Shaver "had the strong sense that it [Patty] was just a presence to him . . . I just remember that [Artz] felt this presence as he was waking." R. 44-5 at 36. Whether Artz thought the "presence" was a person (albeit someone other than Patty) or a demon is not clear from Shaver's testimony, and thus whether it supports a hallucination theory is not clear either.

The story that Artz told to Shaver also conflicts with the stories that he later told Galdi and Cook. According to Shaver, Artz said nothing about demons. R. 1-1 at 14. Yet according to Galdi's testimony at trial, Artz told him that a demon had turned over his bed, sat on his couch, talked to him, and threatened his wife. R. 18-2 at 18-19. Cook testified that Artz told him a demon had threatened him. R. 19-3 at 39. All of this detail was notably absent from Shaver's version of the story, which would have allowed the prosecution to argue, probably quite convincingly, that Artz was making up his story as he went along. Filip's decision not to call Shaver was a reasonable strategic judgment that did not prejudice Artz at trial.

\* \* \*

The district court's judgment is affirmed.

\* \* \*