NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0127n.06

Case No. 20-1384

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

EMMANUEL BEVERLY,

      Petitioner-Appellee/Cross-Appellant,

v.

MATT MACAULEY, Warden,

      Respondent-Appellant/Cross-Appellee.

)
)
)
)
)
)
)
)
)
)
)

**FILED**
Mar 22, 2022
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

Before: CLAY, GIBBONS, and BUSH, Circuit Judges.

GIBBONS, J., delivered the opinion of the court in which BUSH, J., joined. CLAY, J. (pp. 14–45), delivered a separate dissenting opinion.

JULIA SMITH GIBBONS, Circuit Judge. The State of Michigan appeals and Emmanuel Beverly cross-appeals the district court's conditional grant of habeas corpus. The district court granted habeas relief on the basis that Beverly was denied effective assistance of counsel and implicitly rejected his Confrontation Clause claim. Because the state court's application of federal law was not objectively unreasonable and Beverly's Confrontation Clause claim is procedurally defaulted, we reverse the grant of habeas corpus.

**I**

Emmanuel Beverly was convicted of first- and second-degree criminal sexual misconduct against his seven-year-old cousin ("T.B.") after a Wayne County Circuit Court jury trial. At the time of the incident, Beverly and T.B. lived together in their grandparents' house along with T.B.'s mother, father, and sisters. Following the incident, T.B., visibly crying, told his sister, Tiretha,

that Beverly had touched and sucked his "stuff" and had penetrated his anal opening. DE 5-8, Mich. Ct. Trial Tr., Page ID 763, 765. T.B.'s sister alerted their mother who examined T.B., found blood on his buttocks, confronted Beverly, called the police, and took T.B. to the hospital. There, the examining physician found tearing and decreased tone in T.B.'s rectal area.

T.B. subsequently identified Beverly as the perpetrator at a preliminary examination hearing. T.B. said Beverly stuck his finger in T.B.'s butt and tickled his penis. T.B.'s account contained some inconsistencies. For example, he said that he was in the same room as his sister, Tiretha, at the time of the incident, but also that Tiretha was in the room next door. T.B. answered questions detailing the incident posed to him by the prosecution and by defense counsel. However, T.B. was not under oath. He was not asked if he understood the difference between telling the truth and telling a lie, nor did he promise to tell the truth. Beverly's counsel did not object to T.B.'s preliminary examination statements on any grounds.

Later, at trial, T.B. refused to answer questions, and the state trial court declared him unavailable under Michigan Rules of Evidence 804(a)(2) and (a)(4). The prosecution sought to introduce T.B.'s preliminary examination statements into evidence. Beverly's defense counsel did not object to their introduction on the basis that T.B. was not under oath or deemed competent to testify. Instead, defense counsel objected that there was insufficient motive to cross-examine T.B. at the preliminary examination as compared to trial. The state trial court overruled defense counsel's objection and allowed the prosecution to read T.B.'s statements into evidence as former testimony pursuant to Michigan Rule of Evidence 804(b).

The prosecutor, during opening statements, told the jury that T.B. was unavailable for trial, so the jury would instead hear a transcript from the preliminary examination "where the child testified under oath and was asked questions by the prosecutor and by a defense attorney." *Id.* at

731. Before T.B.'s preliminary examination transcript was read, the prosecutor asked the judge to "instruct the jury that [T.B.] would have been sworn to tell the truth before he testified." *Id.* at 739. The judge responded:

> I don't know that he was sworn, he was qualified—he's seven years old so we don't swear seven-year-olds. He was qualified to tell the truth. He was competent, they found that he was competent at that time to testify. . . . And he knew the difference—competent to testify means you know the difference between lying and telling the truth.

*Id.* at 739–40.

T.B's sister Tiretha, his mother, and his examining physician did testify at trial. Tiretha testified that T.B. woke her up, crying, on the night of July 15, 2014. When Tiretha asked him, "[d]id Emmanuel touch you or anything?," T.B. said, "Yeah. He touched my stuff." *Id.* at 763. T.B. told Tiretha that Beverly "touched him on his butt, his stuff and he was playing with his stuff," and that Beverly "put his stuff in his butt." *Id.* at 761, 763; *see also id.* at 766, 776. In Tiretha and T.B.'s family, "stuff" is used to refer to "[p]enis, private part." *Id.* at 765; *see also id.* at 776. Tiretha testified that she was not in the room when the incident occurred. Tiretha woke up their mother and told her what happened. T.B.'s mother, Tia, testified that she "looked at [T.B.'s] booty and his booty was open." *Id.* at 795. She also "seen like a little blood" on T.B.'s butt. *Id.* at 796. T.B. told his mother that Beverly sucked T.B.'s penis and put his penis in T.B.'s butt. Tia confronted Beverly and called the police—who arrested Beverly—and then took T.B. to the hospital via ambulance.

The doctor who examined T.B. at the hospital testified from his medical records. T.B. told the doctor that "this man put his penis in his rectum." *Id.* at 820; *see also id.* at 829–30. T.B. "had a wide perirectal tear into the perineal body, . . . a tear that was involving the mucosa, . . . and decreased tone to his rectum." *Id.* at 824. The decreased tone was consistent with "something being inserted from the outside into the rectum that causes traction or pressure on the skin that

causes tearing," which could be "an adult male's hand or fingers" or an adult male's penis. *Id.* at 825–26. The "loss of tone . . . most commonly occurs in the face of repeated episodes of something being forced into the rectum from the outside." *Id.* at 826.

Following the doctor's testimony, the prosecutor read Beverly's two prior convictions of sexual abuse against children into evidence;[1] the victims in both of those cases were five-year-old boys. The prosecutor subsequently moved to amend the indictment, which previously only alleged that Beverly put his finger in T.B.'s anal opening, to read "Penis in anal opening and/or finger in anal opening" as a basis for the charge. *Id.* at 839. Over defense counsel's objection, the court granted the motion to amend under Section 767.76 of Michigan's Compiled Laws. During closing statements, defense counsel stated "that [the] transcript is totally the only testimony that you have from [T.B.], and it's under oath. He just promises, he don't [sic] know what oath means, he just promises that he's going to tell the truth. And supposedly he told the truth." DE 5-9, Mich. Ct. Trial Tr., Page ID 876. The jury convicted Beverly of criminal sexual conduct in the first and second degrees.

The Michigan Court of Appeals upheld Beverly's conviction against several state law and federal constitutional challenges. Relevant here, the state appellate court rejected Beverly's ineffective assistance of counsel claim for his counsel's failure to object to the introduction of T.B.'s unsworn preliminary examination statements and his Confrontation Clause claim for the introduction of the same. *People v. Beverly*, No. 326199, 2016 WL 6464915, at *4, 6 (Mich. Ct. App. Nov. 1, 2016). The Supreme Court of Michigan denied Beverly's application for leave to appeal. *People v. Beverly*, 501 Mich. 860 (2017).

---

[1] These crimes were admissible and could "be considered for [their] bearing on any matter to which [they were] relevant" under Section 768.27a of Michigan's Compiled Laws.

Beverly then filed a petition for writ of habeas corpus in the Eastern District of Michigan. The district court conditionally granted Beverly's petition on the basis of ineffective assistance of counsel without deciding his Confrontation Clause claim. The state timely filed a notice of appeal, and Beverly cross-appealed. The district court granted a stay pending appeal and issued a certificate of appealability on all of Beverly's claims.

## II

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court cannot grant a state court prisoner's application for a writ of habeas corpus "with respect to any claim that was adjudicated on the merits" in state court, unless the adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1).

If the state court does not consider a habeas petitioner's claim because the petitioner "fail[ed] to raise that claim before the state courts while state-court remedies [were] still available" or because "a state procedural rule . . . prevent[ed] the state courts from reaching the merits of petitioner's claim, that claim is procedurally defaulted and may not be considered by the federal court on habeas review." *Seymour v. Walker*, 224 F.3d 542, 549–50 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 80, 84–87 (1977); *Picard v. Connor*, 404 U.S. 270, 275–78 (1971)).

## III

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "In habeas cases, we give the benefit of the doubt to the state courts' handling of the

case." *Stewart v. Trierweiler*, 867 F.3d 633, 636 (6th Cir. 2017). In order to grant habeas, we must find that "the state court's application of clearly established federal law to the facts of the prisoner's case was objectively unreasonable." *Montgomery v. Bobby*, 654 F.3d 668, 676 (6th Cir. 2011) (en banc) (citing *Williams v. Taylor*, 529 U.S. 362, 409–11(2000)). The petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Thus, the ultimate question for this court is whether "fairminded jurists could disagree" on the correctness of the state court's denial of Beverly's claims. *Yarborough*, 541 U.S. at 664. Due to this highly deferential standard to the state court's decision, we reverse the district court's conditional grant of habeas corpus.

## A

To establish "that counsel's assistance was so defective as to require reversal of a conviction," a convicted defendant must show (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The State "does not contest the district court's finding of Beverly's counsel's deficient performance." CA6 R. 15, Resp't 1st Br., at 4. The prejudice prong requires a defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The defendant must demonstrate "a cause-and-effect relationship between the deficient performance and any prejudice suffered by the defendant." *Williams v. Burt*, 949 F.3d 966, 975 (6th Cir. 2020) (citing *Strickland*, 466 U.S. at 687)). "When a defendant challenges a conviction, the question is whether

there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695.

When a federal court reviews a state court's decision on the merits under AEDPA, however, "relief may be granted only if the state-court decision unreasonably applied the more general standard for ineffective-assistance-of-counsel claims established by *Strickland*." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009). "The question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether it was unreasonable—a substantially higher threshold.'" *Id.* at 123 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Since "the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Id.* (citing *Yarborough*, 541 U.S. at 664 ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")). Thus, a "doubly deferential judicial review" standard "applies to a *Strickland* claim evaluated under . . . § 2254(d)(1)." *Id.* (citing *Yarborough v. Gentry*, 540 U.S. 1, 5–6 (2003) (per curiam)).

The Michigan Court of Appeals held that Beverly was not denied effective assistance of counsel for his trial counsel's failure to object to the admission of T.B.'s unsworn preliminary examination statements. *Beverly*, 2016 WL 6464915, at *9. In Michigan, "a defendant must move for a new trial or an evidentiary hearing in the trial court" in order to preserve an ineffective assistance of counsel claim. *Id.* (citing *People v. Petri*, 279 Mich. App. 407, 410; 760 N.W.2d 882 (2008)). Beverly's counsel did not object to T.B.'s statements at the preliminary examination, which "waived review of [their] admissibility under the theory that [they were] unsworn" according to Michigan law. *Id.* So, "any objection by counsel at trial would have been futile

because the issue was waived." *Id.* The court further found that Beverly could not establish prejudice under *Strickland* because "there was significant corroborating evidence presented at trial of the crime and defendant's role as the perpetrator." *Id.* Writing in partial dissent, Judge Servitto disagreed with the majority's prejudice analysis and would have granted a new trial because an objection by Beverly's trial counsel "could have affected the entire outcome of the trial." *Id.* at *19 (Servitto, J., concurring in part and dissenting in part).

The district court found that the admission of T.B.'s unsworn statements "w[ere] highly prejudicial" to Beverly. DE 8, Op. and Order, Page ID 1318. Specifically, the district court noted misstatements by the prosecutor, trial judge, and trial counsel about the child being sworn, inconsistencies between T.B.'s, Tiretha's, and Tia's accounts, and the prosecution's amendment of the complaint to add an alternative basis for Beverly's charge. *Id.* at 1319–21. Finding the state court's decision "inconsistent with *Strickland*" and therefore unreasonable, the district court conditionally granted Beverly's application for habeas relief based on ineffective assistance of counsel. *Id.* at 1322.

While the district court clearly disagreed with the state court's application of *Strickland*, that is not enough to meet the "substantially higher threshold" required under *Schriro* to grant habeas relief on an ineffective assistance of counsel claim. *Schriro*, 550 U.S. at 473. To agree with the district court and find the state court's application of *Strickland* unreasonable, we must find that no "fairminded jurists could disagree" that the state court erred in holding that Beverly was prejudiced by his counsel's performance. *Yarborough*, 541 U.S. at 664.

That high threshold is simply not met here. The state court considered Beverly's claims on appeal, including the specific arguments now raised in his habeas petition, and adjudicated those claims on the merits. The state court gave a reasonable analysis for its finding that Beverly

did not establish prejudice as required by *Strickland*. *See Beverly*, 2016 WL 6464915, at \*9. Unlike our decision in *Hodge v. Hurley*, 426 F.3d 368, 385–87 (6th Cir. 2005), relied on by the dissent, which highlighted the insufficient corroborating evidence in finding the petitioner suffered prejudice from his counsel's failure to object to prosecutorial misconduct, the state court here analyzed the "significant corroborating evidence presented at trial," including T.B.'s statements to his sister and mother identifying Beverly as the perpetrator, T.B.'s statements to the examining physician, and the physical evidence of sexual assault, to find that Beverly suffered no prejudice. *Beverly*, 2016 WL 6464915 at \*6–9; *see also id.* at \*11 (Shapiro, J., concurring) (noting the court was not "at risk of allowing an innocent defendant's conviction to stand" due to the "significant other evidence of guilt"). Beverly cannot show that "but for" his trial counsel's errors, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see Hodge*, 426 F.3d at 389 ("[I]t might be a reasonable application of *Strickland* for a state court to hold that statements such as these were not prejudicial in a case involving stronger evidence of guilt. . . .").

The state court's "conclusion receives deference under AEDPA," *Trierweiler*, 867 F.3d at 636, and, ultimately, it is highly unlikely that no fairminded jurist could disagree that the state court was incorrect. Indeed, thus far, two judges (Judge Gadola and Judge Shapiro) have decided that Beverly suffered no prejudice, and two judges (Judge Servitto and Judge Tarnow) have concluded he did. Given the "doubly deferential" judicial review standard for evaluating *Strickland* claims under AEDPA, *Gentry*, 540 U.S. at 5–6, we reverse the district court's grant of habeas relief on the basis of ineffective assistance of counsel.

**B**

The Sixth Amendment's Confrontation Clause guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

him." U.S. Const. amend. VI. "Where testimonial evidence is at issue, . . . the Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68 (2004). Statements given at a preliminary hearing constitute "testimonial" evidence and are thus covered under the clause. *See Davis v. Washington*, 547 U.S. 813, 822 (2006). Beverly's Confrontation Clause rights were clearly "at issue" when the state court allowed T.B.'s preliminary examination statements to be read into evidence. *Peak v. Webb*, 673 F.3d 465, 472 (6th Cir. 2012).

Because the state appellate court reviewed Beverly's Confrontation Clause claim for plain error due to failure to comply with a state procedural rule, *Beverly*, 2016 WL 6464915, at *2–3, our review of the claim might be precluded, *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Beverly's Confrontation Clause claim is procedurally defaulted if (1) he "fail[ed] to comply with a state procedural rule; (2) the state courts enforce the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) [he] cannot show cause and prejudice excusing the default." *Guilmette v. Howes*, 624 F.3d 286, 290 (6th Cir. 2010) (en banc); *see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). "Michigan's contemporaneous-objection rule is both a well-established and normally enforced procedural rule." *Taylor v. McKee*, 649 F.3d 446, 451 (6th Cir. 2011). Thus, Beverly's claim is procedurally defaulted if the state court's plain error review is an adequate and independent state ground, he did not comply with the procedural rule, and the default is not excused by cause and prejudice.

A state court's plain error review constitutes "procedural default on an independent and adequate state ground." *Wogenstahl v. Mitchell*, 668 F.3d 307, 337 (6th Cir. 2012); *see also Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006). In Michigan, if a defendant fails to object

at trial, the "issue is forfeited unless defendant demonstrates outcome-determinative plain error." *People v. Watson*, 245 Mich. App. 572, 588 (2001); *see also Taylor*, 649 F.3d at 450. The state appellate court considered Beverly's Confrontation Clause argument "unpreserved because his counsel failed to raise it below," and thus reviewed the argument "for plain error affecting substantial rights." *Beverly*, 2016 WL 6464915, at *3. Under Michigan's plain error review, "reversal is warranted only if a plain error resulted in the conviction of an actually innocent defendant or if the error seriously affected the fairness, integrity or public reputation of the proceedings regardless of the defendant's innocence." *Id.* at 4 (citing *People v. Carines*, 460 Mich. 750, 763 (1999)). Given the amount of corroborating evidence presented at trial, the state court found that reversal was unwarranted under plain error. *Id.*

Beverly argues the state court's plain error review should not constitute procedural default because "[t]rial counsel objected to the admission of the preliminary exam on the grounds that it denied Mr. Beverly his right to cross-examination." CA6 R. 20, Pet'r 2d Br., at 22. Beverly's trial counsel, however, did not make contemporaneous objections based on Beverly's Confrontation Clause rights. When discussing whether to declare T.B. unavailable at the state trial, defense counsel pointed to the different motives for cross-examination at a preliminary hearing and cross-examination at trial, stating that the cross-examination that occurred at the preliminary hearing is "not the type of cross-examination that would take place in this particular matter in a jury trial." DE 5-7, Mich. Ct. Trial Tr., Page ID 605. Defense counsel then argued that Beverly did not "have the cross-examination [that] is necessary when these types of charges are levied against an individual." *Id.* at 606. Because defense counsel cross-examined T.B. at the preliminary examination in "the exact same case," the state trial judge ruled that T.B.'s preliminary examination statements were admissible under Michigan Rule of Evidence 804. *Id.* at 608. The

Michigan Court of Appeals upheld that finding while specifically considering the fact that T.B. was not under oath during the preliminary examination. *Beverly*, 2016 WL 6464915, at *2, 4.

It is clear from the state trial court record that defense counsel was objecting solely on evidentiary hearsay grounds, not on constitutional Confrontation Clause grounds. Defense counsel twice pointed out the different motive for cross-examination at the preliminary examination compared to trial in an attempt to persuade the judge to find T.B.'s preliminary examination did not meet the requirements of Michigan Rule of Evidence 804, which concerns hearsay. He did not argue that Beverly did not have an opportunity to cross-examine T.B. sufficient to satisfy the Confrontation Clause, only that there was insufficient motive during the preliminary examination. Defense counsel did not connect his evidentiary hearsay arguments regarding the different motives to Beverly's constitutional rights. Beverly did not comply with Michigan's contemporaneous objection rule and therefore the state court's plain error review is an independent and adequate state ground. His Confrontation Clause claim is procedurally defaulted unless he can show cause and prejudice excusing the default.

"The 'cause' standard in procedural-default cases requires the petitioner to show that 'some objective factor external to the defense impeded counsel's efforts' to raise a claim in the state courts." *Wogenstahl*, 668 F.3d at 321 (quoting *McCleskey v. Zant*, 499 U.S. 467, 493 (1991)). "[A]n attorney error rising to the level of ineffective assistance of counsel" can constitute such a factor. *Id.* (citing *McCleskey*, 499 U.S. at 493–94). "Attorney error short of ineffective assistance of counsel, however, does not constitute cause and will not excuse a procedural default." *McCleskey*, 499 U.S. at 494 (citing *Murray v. Carrier*, 477 U.S. 478, 486–88 (1986)). If Beverly establishes cause, he must then show "'actual prejudice' resulting from the errors of which he

complains." *United States v. Frady*, 456 U.S. 152, 168 (1982). "Absent cause and prejudice, [this court] may not reach the merits of [his] claim." *Wogenstahl*, 668 F.3d at 337.

As discussed above, however, Beverly cannot establish prejudice from the introduction of T.B.'s unsworn preliminary examination statements. *Beverly*, 2016 WL 6464915, at *9. Because Beverly is unable to establish cause and prejudice, his Confrontation Clause claim is procedurally defaulted and we cannot review the merits of the claim.

**IV**

We reverse the decision of the district court and deny Beverly's writ of habeas corpus.

CLAY, Circuit Judge, dissenting. A seven-year-old complainant and victim of an alleged sexual assault, T.B., gave unsworn testimony at a preliminary hearing inculpating Petitioner Emmanuel Beverly. On the eve of trial, T.B. was declared unavailable to testify, and the judge permitted the unsworn transcript to be read to the jury in lieu of the child's live testimony. What went unnoticed by the defense counsel, prosecutor, and judge is that T.B. was never administered an oath or otherwise adjudged competent to testify at the probable-cause hearing. Worse still, all three officers of the court told the jury that T.B. was sworn, under oath, or otherwise able to offer truthful testimony. No fewer than six times was the jury invited to rely on the transcript under this incorrect belief. Defense counsel failed to object to the transcript's admission on the theory that it was unsworn, particularly troubling since that unsworn statement was the only evidence directly incriminating Beverly. Now, in these cross-appeals, each party seeks review of the district court's conditional grant of habeas relief, issued pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d)(1).

Beverly was denied effective assistance of counsel and the right to be confronted with adverse witnesses. The majority's conclusion that the state court did not unreasonably apply clearly established federal law is mistaken and results in two errors of constitutional magnitude. First, in finding no prejudice resulted under *Strickland v. Washington*, 466 U.S. 668 (1984), the majority mischaracterizes the factual record, downplays the significance of the material misrepresentations made by the judge, prosecutor, and defense counsel to the jury, and declares that the so-called corroborative evidence dispels the prejudicial impact of the unsworn transcript's admission. Second, in its Confrontation Clause analysis, the majority falters at the outset by finding the issue procedurally defaulted; furthermore, Beverly never had an adequate prior

opportunity for cross-examination, which is required by *Crawford v. Washington*, 541 U.S. 36 (2004).

## I.    BACKGROUND

The factual basis for the two-part complaint against Beverly was the allegation that he engaged in sexual acts with his cousin, then-seven-year-old, T.B.  The original basis for Count One, i.e., criminal sexual conduct in the first degree, was digital-anal penetration.  However, midway through the three-day trial—of which the jury was present only for about six hours—the trial court permitted the state to amend Count One to include penile-anal penetration, along with the pre-existing charge of digital-anal penetration.

### A. Preliminary Examination

On August 21, 2014, T.B. appeared at the preliminary examination.  He was never placed under oath or affirmation, though both the prosecutor and defense asked the unsworn minor questions.  A summary of his unsworn testimony follows.

T.B. lives in a multi-generational household owned by his grandmother.[1]  For purposes of the examination, it was stipulated that this alleged assault occurred on July 15, 2014.  T.B. testified that Beverly did "something" to him at his grandmother's house.  (Tr., R. 5-2, PageID # 521).  When asked to specify, T.B. said that Beverly did "something" to his "back," pointing to his buttocks.  (*Id.* at PageID ## 521–22).  T.B. elaborated that Beverly "st[u]ck something in [his] butt," clarifying that Beverly stuck a finger in T.B.'s rectum.  (*Id.* at PageID # 522).  T.B. also said that Beverly used his hand to "[t]ickle" his "part" and pointed to his genital area.  (*Id.* at PageID # 524).  After this alleged sexual contact, T.B. told his sister, Tiretha.

---

[1] Residents of the home, other than T.B., included the grandmother, Dorthea; the grandfather, unnamed on this record; T.B.'s sisters, Tiretha, Meek-Meek, Tasha, and Nay-nay; his mother, Tia Dukes; his father, Thomas Baynam; and his cousin, Petitioner Emmanuel Beverly; a young adult by the name of Mikayla also lived there.

T.B. said that this incident occurred in Tiretha's bedroom but that his sister was in a different room.  A moment later, however, he said that his sister was in the same room, asleep, at the time of the incident.

The examination lasted just twenty minutes, with T.B. present for less than fifteen of those.  Thereafter, Beverly was bound over for trial on a two-count complaint alleging first- and second-degree criminal sexual conduct of a person under thirteen.[2]

### B.  Trial in the Circuit Court for Wayne County

On December 8, 2014, before the trial began, the trial court declared the child unavailable under MRE 804(a)(2) and (4).  In requesting the unavailability finding, the prosecutor submitted: "T.B. testified at the preliminary examination under oath[,] and there is a transcript of that."  (Tr., R. 5-7, PageID # 585).  Separately, later that day, the judge declared a mistrial after the initial jury pool observed Beverly in handcuffs, which required the assembly of a new pool; as a result, the trial did not start in earnest until the following day.  With the new jury selected, the case began on December 9.  Out of the gate, the prosecutor misrepresented the record to the jury.  The prosecutor said:

> Now, normally in a case like this[,] the little seven-year-old would take the witness stand and testify.  But the Judge has made a ruling that [he] is unavailable for purposes of trial.  So[,] what you're going to hear instead is a transcript of testimony that was taken in August of 2014 at the Hamtramck District Court[,] where the child testified under oath and was asked questions by the prosecutor and by a defense attorney.
>
> So instead of having the live child[,] we're going to have the young man sitting in the first row play the role of the child and read the lines of the transcripts to give you the answers the child gave back then.

(Tr., R. 5-8, PageID # 731).  The prosecutor also informed the jury of Beverly's Wayne County juvenile court records from 2001 and 2003, "when that man sexually assaulted two other boys."

---

[2] The trial judge summarized T.B.'s allegations as follows: "[H]is private in front was tickled and his buttock, the Defendant stuck his hand in his butt—his finger, and the Court will find that this is a question of fact on both charges and bind the Defendant over on both charges contained in the complaint."  (Tr., R. 5-2, PageID # 530).

(*Id.* at PageID # 732; *see id.* at PageID # 733 ("[H]e has a propensity for sexually assaulting young boys between the ages of five and seven years old. That's what he likes. So[,] you're allowed to consider that when you decide if he's guilty in this case.")).

Once opening statements concluded, the prosecutor asked the judge to instruct the jury regarding T.B.'s unavailability. The judge did so and said:

> At the preliminary examination[,] [T.B.] did testify. He was determined—a copy of the testify [sic] at the preliminary exam[,] and he was questioned by both the prosecution and defense. So[,] I have allowed that testimony to be used in lieu of or in place of the boy's live testimony.

(*Id.* at PageID # 737). Soon after that, the prosecution called to the witness stand an assistant prosecutor "with a copy of the examination transcript [to] read the role of the child." (*Id.* at PageID # 738). Before the rendition of the preliminary examination commenced, the prosecutor asked the judge to "instruct the jury that [T.B.] would have been sworn to tell the truth before he testified." (*Id.* at PageID # 739). The judge responded:

> Yes, I did say that. I think you all heard me say that he was sworn to tell—well, I don't know that he was sworn, he was qualified—he's seven years old[,] so we don't swear seven-year-olds. He was qualified to tell the truth. He was competent, they found that he was competent at that time to testify. . . . And he knew the difference—competent to testify means you know the difference between lying and . . . telling the truth.

(*Id.* at PageID # 739–40). The preliminary examination transcript was then read into the record for the jury.

### 1. Testimony of T.B.'s Older Sister, Tiretha Dukes

T.B.'s sixteen-year-old sister, Tiretha Dukes, testified that T.B. woke her up on July 15, 2014, while she was asleep in her upstairs bedroom. She recalled that T.B. was crying, prompting her to ask: "[D]id Emmanuel touch you or anything?" (*Id.* at PageID # 760). In response, she testified that T.B. said Petitioner "touched him on his butt, his stuff[,] and he was playing with his

stuff." (*Id.* at PageID ## 760–61). Notably, however, Tiretha confirmed that her brother did not "tell [her] exactly what [Petitioner] did to his butt." (*Id.* at PageID # 761).

At this point in her testimony, Tiretha started to cry; after a brief recess—during which time she spoke with her mother, Tia Dukes, who would testify next, as well as a victim's advocate—her testimony provided additional details. (*Id.* at PageID ## 771–72). She testified that when T.B. roused her from sleep, he told her that Beverly "put his stuff in his butt." (*Id.* at PageID # 763). The sister confirmed that their family uses the word "stuff" to refer to "a man's private area." (*Id.* at PageID # 764). She added that T.B. said to her that Beverly "played with [T.B.'s penis and] sucked it." (*Id.* at PageID # 765). The sister testified that she then woke up her and T.B.'s mother to relay this information.[3] Additionally, the sister claimed that T.B. told her the sexual contact occurred in the basement (where Beverly was living) rather than in her bedroom, as T.B. said at the preliminary examination. (*Id.* at Page ID # 773).

### 2. Testimony of T.B.'s Mother, Tia Dukes

T.B.'s mother, Tia Dukes, testified that Tiretha woke her up at about 11:00 a.m., marking when she first learned of the incident. The mother examined T.B.'s buttocks, which she said were "open." (*Id.* at PageID # 795). She also noticed "a little blood" (*id.* at PageID # 796), prompting her to call the police; an ambulance transported her and her son to the hospital. At some point, T.B. told her that Beverly "sucked his penis" and "stuck his penis in his behind." (*Id.* at PageID ## 809–10). However, T.B. did not tell her that Beverly put his fingers in his rectum, which he testified to during the preliminary examination.

---

[3] Tiretha recalled that her mother inspected T.B.'s buttocks, called the police, and took T.B. to the hospital via an ambulance. (*Id.* at Page ID # 769), though she acknowledged on cross that she was not in the room when her mother examined T.B. (*Id.* at PageID # 771).

### 3.   Testimony of Examining Physician, Stephen Knazik, D.O.

The pediatric emergency-room physician testified next.  Relying on his medical notes, he testified that T.B. was brought in to be evaluated for possible sexual assault or abuse.  From his physical inspection of T.B., the doctor recalled some rectal tearing, which did not require stitches, and did not report seeing any blood.  The tearing "c[ould] only happen with an injury that starts from the outside and goes in."  (*Id.* at PageID # 825).  Further, the doctor agreed that the injury could be consistent with an adult male's finger, penis, or anything "of a similar size" that is "inserted against the tension of the rectum itself that overcomes the ability of the skin to stretch." (*Id.* at PageID ## 825–26).  Typically, he said, this sort of rectal tearing would occur over time rather than in one episode.  Notably, T.B. told the doctor that "this man put his penis in his rectum," but the assailant's identity was not specified to the doctor.  (*Id.* at PageID # 820).

### 4.   Prosecution's Theory of the Case Changes

After the sister's, mother's, and doctor's testimony, the prosecution sought to amend the Felony Information to Count One from referring to a finger in anal opening to a "[p]enis in anal opening and/or finger in anal opening."  (*Id.* at PageID # 839).  The court permitted the amendment over defense counsel's objection.[4]

### 5.   Closing Arguments and Conclusion of Trial

The prosecution rested on the third and final day, December 10, 2014.  As to T.B.'s unavailability, the prosecutor stated as follows:

---

[4] Counsel stated:

> They can't at the last minute try to change their theory of the case. . . . They made their case out with a finger, now and we don't have the complaining witness that comes to testify in this particular matter, the only thing he talks about is a finger in his rectum, and now they want to try to change it because everything that's coming out said it's something totally contrary.  This is not new information[,] and I don't think they should be allowed to now try to confuse this jury by adding something that was never their theory.

(*Id.* at PageID # 840; *see also* T.R. 5-9, PageID # 846 ("I feel it's prejudicial, it changes the focus of the trial)).

> Well, first, unfortunately[,] you didn't get to see the child testify live, and that's very unusual. . . . You also had read to you, and you can take it into the jury room with you, his preliminary exam testimony where he answered the questions. He wasn't the smartest or most articulate kid[,] but he did talk[,] and he did answer the questions about this offense. And then[,] for some reason[,] this week the child shut down. . . . he's not willing to talk about it.
>
> So[,] what you're left with is understanding what he said in the transcript without really seeing him with your own eyes. But I asked the family members, how did [T.B.] get along with Mr. Beverly? And everybody said they got along fine. . . .
>
> So why would this seven-year-old make up a lie about Mr. Beverly, a man with whom he gets along fine[?] And is this child who's only seven who seems really smart, a smart seven-year-old, is he even sophisticated enough to create a lie like this? So I submit to you that this child had no reason to lie. . . .
>
> Next, is there medical evidence? You heard from the doctor yesterday. There was absolutely medical proof that this child's anus was penetrated. The doctor says he didn't tell me it was a finger, he told me it was a penis. But in the exam transcript [T.B.] says it was a finger. It's probably both.

(*Id.* at PageID ## 865–67). Similarly, defense counsel concluded by impressing upon the jury that the testimony was sworn: "[T]hat transcript is totally the only testimony that you have from [T.B.], and it's under oath. He just promises, he do[es]n't know what oath means, he just promises that he's going to tell the truth. And supposedly[,] he told the truth." (*Id.* at PageID # 876).

Beverly was convicted of first-degree sexual conduct and second-degree sexual conduct; he was sentenced to concurrent terms of 30 to 60 years' imprisonment for the first offense and 10 to 15 years for the second offense.

## C. Direct Appeal & Habeas Petition

### 1. Michigan Court of Appeals

Beverly appealed to the Michigan Court of Appeals. On direct appeal, Beverly contested the admission of the unsworn transcript on two grounds: ineffective assistance of counsel for failing to object on the basis it was unsworn; and denial of the right to be confronted with adverse

witnesses. A divided Michigan Court of Appeals denied both claims, affirmed the convictions, but remanded for sentencing.

The lead opinion found no Sixth Amendment violation because counsel did not object at the time the victim made his statements at the preliminary examination, thus resulting in a waiver of the issue. The same result carried under plain error review. Nor was Beverly's argument that he was deprived of an opportunity to cross-examine T.B. of any moment because the defense had a similar motive to develop the complainant's testimony at the preliminary examination as it would have had at trial, had T.B. not been found unavailable. That the prosecution made an eleventh-hour amendment to the indictment did not constitute a significant limitation concerning the scope of the defense's prior questioning. The ineffective assistance of counsel claim fared no better. The court held that nothing amounted to reversible error, and, at any rate, counsel's failure to object to the testimony at the preliminary examination waived review of its admissibility under the theory that it was unsworn, so any resulting objection at trial would have been futile since the issue was waived; and counsel cannot be deemed ineffective for failing to raise a futile objection. Nor did admission of the preliminary examination testimony prejudice the defense given the corroborating evidence of the crime.

Two judges of the three-judge panel wrote separately. Each would have found that the preliminary examination testimony issue was forfeited but not waived, meaning the error was not extinguished but, rather, still reviewable on appeal for plain error affecting substantial rights. From here, these two judges diverged. Judge Shapiro, in concurrence, agreed with the lead opinion that reversal was not needed, deeming defense counsel's questioning at the preliminary examination adequate for confrontation purposes and other evidence presented at trial dissipated any prejudicial taint. Judge Servitto, who dissented in part, disagreed. She would have found that the transcript's

admission constituted plain error affecting substantial rights and would have reversed and remanded for a new trial. *Strickland* prejudice resulted from the jury proceeding under the mistaken belief that T.B. had either been under oath or been found qualified to testify. (*Id.* at PageID # 975 ("Having a witness sworn before giving testimony is a basic rule of evidence.")).

### 2. Michigan Supreme Court and Federal District Court

Beverly applied for leave to appeal in the Michigan Supreme Court, which the court denied. That denial was followed by Beverly's petition to federal court on habeas review. That petition raised two issues, whether: (1) admission of the complainant's statements at trial violated his right to confront the witnesses against him; and (2) he was denied effective assistance of counsel when counsel failed to object to the admission of the preliminary examination transcript. The district court conditionally granted Beverly's habeas relief on his second claim challenging his counsel's ineffectiveness in failing to object to the victim's unsworn testimony being read into the record at trial. (Order, R. 8, PageID # 1322 ("Unless the state takes action to afford Petitioner a new trial within ninety days, he may apply for a writ ordering Respondent to release him from custody.")). It found counsel's failure to object to the admission of the transcript on the basis that the statement was unsworn (and the complainant unqualified) amounted to ineffective assistance of counsel that prejudiced Beverly. The proceedings were stayed, and these cross-appeals followed.

## II. DISCUSSION

### A. Unreasonable Application Prong of 28 U.S.C. § 2254(d)(1)

This Court's review of the state court's decision is circumscribed by 28 U.S.C. § 2254(d)(1) of AEDPA. A state court's decision should not be disturbed on habeas review unless the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." The "unreasonable

application" prong of § 2254(d)(1) guides review in this case. Under the unreasonable-application prong, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (citing another source).

The deferential restrictions § 2254(d) imposes apply only to claims that the state court adjudicated "on the merits," i.e., when the state court decides a prisoner's writ based on the substance of the federal law claim advanced, rather than on a procedural rule or a rule precluding a state court's merits review. *Harrington v. Richter*, 562 U.S. 86, 100 (2011). A review of the state court's order and the Supreme Court's guidance on this issue require a presumption that this decision was on the merits. The majority opinion is correct that Petitioner has not overcome that presumption; however, even when filtered through AEDPA's highly deferential lens, the state court's determination was an unreasonable application of federal law.

## B. Ineffective Assistance of Counsel

### 1. Legal Standard

The well-established federal law to assess an ineffective assistance counsel claim is *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* imposes a two-part test. The first prong assesses counsel's performance. A petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *Id.* at 688. Counsel must have "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. "Judicial scrutiny of counsel's performance must be highly deferential," *id.* at 689, meaning a "strong presumption" exists, even under a *de novo* review, "in favor of finding that counsel's performance 'falls within the wide

range of reasonable professional assistance.'" *White v. Mitchell*, 431 F.3d 517, 528 (6th Cir. 2005) (quoting *Strickland* 466 U.S. at 689). Second, to amount to a constitutional violation, the error by counsel must have been prejudicial to the defendant. *Strickland*, 466 U.S. at 690. To prove prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Because the *Strickland* standard is general in nature, significant deference applies to state court decisions when assessing it under § 2254(d). *Richter*, 562 U.S. at 105. Deference under the cause prong is "doubly deferential." *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011). For AEDPA purposes, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101.

## 2. Failure to Object

The source of ineffective assistance in this case is the trial counsel's failure to object to the admission of the unsworn transcript on the basis that the complainant was unsworn. Respondent concedes that defense counsel's performance was deficient, so it is undisputed on appeal that Beverly's counsel's conduct neither "[fell] within the wide range of reasonable professional assistance" nor demonstrated "sound trial strategy." *Strickland*, 466 U.S. at 689. The remaining question is whether the state court finding that defense counsel's performance did not prejudice Beverly was an unreasonable application of clearly established Supreme Court precedent, *i.e.*, *Strickland*.

The majority submits that counsel's failure to object did not prejudice the defense. The record indicates otherwise; when reviewed closely, the record reveals that the failure to object to the admission of the unsworn transcript ushered in numerous prejudicial and misleading statements

from the judge, prosecutor, and defense counsel, concerning the transcript's reliability and truthfulness. Where the result depended primarily on the jury's credibility determinations, a failure to object to the only piece of evidence from the complainant—and the only direct evidence inculpating counsel's client—carries a high probability of affecting the jury's verdict. In addition, the evidence the majority opinion describes as "corroborating" is better characterized as inconsistent evidence that further undermines confidence in the jury verdict. Two reasons (misrepresentations to the jury and the lack of corroborating evidence) indicate that the majority reaches an incorrect conclusion.

### a. *Misrepresentations from the judge, prosecutor, and defense counsel*

First, time and again, the three officers of the court told the jury that T.B. was sworn or otherwise deemed competent to give truthful testimony at the probable-cause hearing. None of this was true. More alarming still is that defense counsel failed to object to the transcript on the theory that it was unsworn. If he had, the transcript would never have been given the imprimatur of truth, clothed as it was in repeated assertions that the testimony was the result of truthful and balanced questioning. Counsel's errors were so severe as to deprive Beverly of a fair trial.

Judicial review of the admission of unsworn testimony often occurs where a petitioner alleges ineffective assistance of counsel for failure to object to prosecutorial misconduct. A representative case is *Hodge v. Hurley*, 426 F.3d 368 (6th Cir. 2005). There, a habeas case presenting analogous facts to the case *sub judice*, this Court found trial counsel ineffective for failing to object to such misconduct. Under AEDPA, we found the Ohio Court of Appeals' determination to the contrary an unreasonable application of *Strickland*.

A review of the *Hodge* facts is helpful. Petitioner Demarkus Hodge was convicted of raping his girlfriend Consuela Fenn's three-year-old daughter. On the day of the alleged assault,

the child's grandmother noticed blood in the child's underwear and small cuts in the child's genital area, prompting someone to call the police. At the hospital, the doctor observed "minor injury to [the child's] genital area, but apparently did not make any diagnosis as to whether [she] ha[d] been sexually assaulted." *Id.* at 372. A few weeks later, a nurse practitioner performed a genital examination on the child. She did not find physical evidence of sexual abuse, but she noted that such abuse was "possible," later elevating her assessment to "probable," upon review of the police reports. *Id.* at 374.

Three times before trial, Fenn spoke with detectives. The first two times, she never mentioned a highly relevant allegation, namely, that she witnessed her boyfriend sexually assaulting her daughter; she later revised her report to the police at her mother's behest. At trial, she did, in fact, testify that she saw Hodge penetrating her daughter. In closing arguments, the prosecutor repeatedly commented on witness credibility. He told the jury that Hodge, who had taken the stand in his own defense, was "lying to extricate himself from what he's done," *id.* at 377, and urged the jury to instead find Fenn's testimony "absolutely believable." *Id.*

The Ohio Court of Appeals rejected all of Hodge's claims. On a habeas petition, this Court found the state court decision to be an unreasonable application of *Strickland*. Particularly egregious was defense counsel's failure to object to the "patently improper" comments from the prosecutor on witness credibility and the expression of "a personal belief that a particular witness is lying." *Id.* at 378. Accordingly, the prosecutor's comments prejudiced the defense since they:

> suggest[ed] to the jury that the prosecutor knows something they do not. . . . they convey an impression to the jury that they should simply trust the State's judgment that Fenn was a credible witness and the defendant's witnesses were non-credible, if not perjurious. This misconduct is especially prejudicial in this case[,] given the extent to which the jury's determination as to Hodge's guilt or innocence hinged almost entirely on the credibility of Hodge and Fenn.

*Id.* at 378–79. Hodge's counsel's failure to object to the prosecutor's statements was prejudicial for another reason: the prosecutor "repeatedly—and incorrectly . . . blatant[ly] misrepresent[ed]" the evidence. *Id.* at 380; *see id.* at 386 ("[T]hese statements are harmful to Hodge's case precisely because they are false, unsupported, or misleading, rather than because they are true but inadmissible.").

The error is more substantial in this case, where the defense counsel's deficient performance resulted in the three officers of the court preaching a unified message to the jury: that T.B. was either under oath or swore to tell the truth. A detailed look at the record shows that misstatements of the transcript's reliability pervaded the short trial, thereby undermining confidence in the trial's outcome.

It is useful to summarize the misrepresentations from the judge, prosecutor, and defense counsel. As set forth above, opening statements began with the prosecutor informing the jury that "the child testified under oath [at the preliminary examination]" and was asked questions by the prosecutor and by a defense attorney. (Tr., R. 5-8, PageID # 731). The judge's instructions to the jury shortly thereafter were nearly identical. (*Id.* at PageID # 737 (stating that T.B. "did testify" and "was questioned by both the prosecution and the defense.")). Once more, the prosecutor asked the judge to "instruct the jury that [T.B.] would have been *sworn to tell the truth before he testified*." (*Id.* at PageID # 739 (emphasis added)). The judge responded: "I think you all heard me say that he was sworn to tell . . . [or] qualified to tell the truth. He was competent, they found that he was competent at the time to testify . . . [C]ompetent to testify means you know the difference between lying and telling the truth." (*Id.* at PageID # 739–40).

References to the unsworn transcript, and the attendant mischaracterizations of the transcript as sworn, did not end here. The jury was reminded of the transcript's supposed reliability

during closing arguments. For example, defense counsel stated: "And that [preliminary examination] transcript is totally the only testimony that you have from [T.B.], and it's under oath. . . . he just promises that he's going to tell the truth. And supposedly[,] he told the truth." (Tr., R. 5-9, PageID # 876).

On appeal, respondent acknowledges the falsity of these statements but contends that the prejudicial impact was insignificant, characterizing the misrepresentations as fleeting. Only an unfaithful reading of the trial transcripts supports that view. Placing the above misrepresentations in context reveals why the state's arguments are unconvincing. The trial lasted three days. The judge declared a mistrial on the first day. The next day, the court assembled a new jury pool, jury selection concluded midday, and arguments commenced. The prosecution and defense rested on the third and final day; the jury began deliberations and returned a guilty verdict. Thus, over just six hours, and no less than six times, the judge, prosecution, and defense spotlighted for the jury not just the centrality of the unsworn transcript but also misrepresented that testimony as sworn and truthful.

Drawing on *Strickland* and its progeny, two legal points indicate that the state court and majority misconstrue the impact of these misrepresentations on the jury verdict.

The first issue with the state court's and majority's prejudice analyses is they ignore the well-established principle that "asserting facts that were never admitted into evidence may mislead a jury in a prejudicial way." *Washington v. Hofbauer*, 228 F.3d 689, 700 (6th Cir. 2000) (citing *Berger v. United States*, 295 U.S. 78, 84 (1935). "This is particularly true when a prosecutor misrepresents evidence because a jury generally has confidence that a prosecuting attorney is faithfully observing his obligation as a representative of a sovereignty." *Id.*

In this case, the prosecutor acted in concert with the trial judge and the defense counsel to parade "a set of serious misrepresentations" before the jury. *See Hodge*, 426 F.3d at 382. Rarely do adversaries in the judicial process make common cause to misinform the jury, along with the judge, as to a central piece of evidence. At each point, defense counsel failed to object to the admission of the transcript based on it being unsworn. *See id.* at 384 ("[E]ach instance of prosecutorial misconduct—and the failure to object thereto—must not be considered in isolation, but in . . . context . . . ."). Nor was the failure to object a strategy to let inadmissible evidence slide into trial without drawing the jury's attention to it. Quite the reverse. Counsel, along with the prosecutor and the judge, took affirmative steps to draw the jury's attention to the unsworn transcript.

To suggest, as the majority holds, that the jury's decision was free from improper taint ignores how the trial proceeded and the transcript's centrality therein. What is more, that the reinforcement of the transcript's reliability came through *these* three sources, presented as neutral and authoritative in this credibility contest, heightened the likelihood of prejudice. *See People v. Douglas*, 496 Mich. 557, 601 (2014). Drawing on *Hodge*, it becomes apparent that defense counsel's failure to object to the unsworn testimony, which permitted the misstatements of the transcript's reliability to parade before the jury, harmed the defense, surpassing even the high bar that AEDPA imposes.

Beverly's counsel's failure to object led to a fundamentally unfair trial for an additional reason. Under *Strickland*, a fair trial is one in which evidence is subjected to adversarial testing and presented for resolution before an impartial factfinder. Part and parcel of a fair jury trial is the jury's duty to independently assess witness credibility and decide how much evidence to credit. *Hodge*, 426 F.3d at 387 (considering the jury's appraisal of witness credibility in *Strickland*

prejudice analysis) (citing *Strickland*, 466 U.S. at 695–96). The laws vesting the jury with these evidentiary duties do not divvy up credibility-determinations between the jury and officers of the court. Instead, "the jury alone is charged with forming a conclusion as to the truth of the testimony offered." *Norfolk & W. Ry. Co. v. McKenzie*, 116 F.2d 632, 635 (6th Cir. 1941). So, the Michigan Court of Appeals was correct when it incorporated this axiom in its Confrontation Clause analysis: "The jury is responsible [for determining] the credibility of witnesses." (Order, R. 5-12, PageID # 939). It faltered on the prejudice prong, where it determined that no redressable error occurred because the jury was still able to weigh the testimony and make credibility determinations.

Similar to the defense counsel's failure to object to prosecutorial misconduct in *Hodge*, 426 F.3d at 377 ("[Hodge] is lying to extricate himself from what he's done."), the prosecutor in the instant case bolstered the reliability of T.B.'s unsworn statement, asking the jury to consider: "[W]hy would this seven-year-old make up a lie about Mr. Beverly. . . . is he even sophisticated enough to create a lie like this?" (Tr., R. 5-9, PageID ## 866).

Statements from the prosecution, trial judge, and Beverly's defense counsel, together and apart, likely caused the jury to supplant its own credibility assessments for those of the three representatives of the judicial system. *See Berger*, 295 U.S. at 88 ("Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none."); *Hodge*, 426 F.3d at 377 ("Unfortunately, when a prosecutor does act unfairly, there is little a defendant can do other than rely on his or her attorney to lodge an appropriate and timely objection."). Herein lies a core error from which the resulting prejudice sprung in this case. This case required the jury to unravel and choose between conflicting versions of an apparent assault. Where a trial is "essentially . . . a swearing contest" that turns largely on witness credibility, then the risk of "harmful inferences" is

"heightened." *Taylor v. Kentucky*, 436 U.S. 478, 487–88 (1978). A record presenting dueling versions of events makes the jury's duty to make credibility determinations all the more delicate.

Had the jury been confronted with the considerable fact that T.B.'s testimony was unsworn, there is a reasonable probability that it would have reached a different conclusion. *See McKenzie*, 116 F.2d at 635 ("[O]nce a witness is determined by the judge to be qualified to speak, the weight and credibility of every portion of his testimony is for the jury."). Defense counsel's failure to object to the unsworn transcript on the basis that it was unsworn ushered in comments bolstering the transcript's reliability, thereby interfering with the jury's exclusive duties to weigh evidence and assess witness credibility.

Our Court's language from *United States v. Shoupe*, 548 F.2d 636 (6th Cir. 1977), is illuminating with respect to the problem of presenting unsworn witness statements to the jury:

> [W]e find no precedent sanctioning the recitation in the presence of the jury of extended unsworn remarks[] attributed to a Government witness, which were allegedly recorded in an unverified document and which inculpate the defendant. Courts have condemned this practice as cloaking potentially self-serving accounts of a witness'[] statements with the dignity and credibility of the prosecutor's office, as increasing the probability that the jury will consider the statements as substantive evidence despite any limiting instruction to the contrary, as placing before the jury the content of patently inadmissible past recollection recorded, and as bypassing, to the prejudice of the defendant, reasonable alternative measures to accomplish the same legitimate result.

*Id.* at 641 (citations omitted).

### b. *Inconsistent Evidence*

Second, the majority is incorrect that the other evidence presented at trial dispels the prejudice caused by the unsworn transcript's admission. In *Strickland*, the Supreme Court observed that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." 466 U.S. at 696. The state court of appeals in this case concluded that Beverly "cannot show that admission of the victim's preliminary examination testimony was prejudicial . . . because there was significant corroborating

evidence presented at trial of the crime and defendant's role as the perpetrator." (Order, R. 5-12, PageID # 942). Such a finding reflects a failure to adequately review the record. The proper holding would be to find that the state court's holding constituted an unreasonable application of *Strickland*.

Inconsistent, incomplete, and contradictory evidence abounded at trial. Indeed, the record equivocates on the time, place, manner and method of the alleged assault, and physical evidence thereof. The majority downplays these inconsistencies, finding, on balance, that enough evidence supported conviction. Yet, the case against Beverly was based almost exclusively on weak circumstantial evidence. No physical evidence ties Beverly to the crime, and other than the unsworn transcript, the only evidence connecting Beverly to T.B.'s physical injuries were second-hand accounts. Of course, the jury likely found persuasive evidence other than the unsworn transcript; but the prosecution's case was far more robust with T.B.'s highly inculpatory statement as its centerpiece. Given the weakness of the State's case—the absence of inculpatory physical proof and the reliance on weak circumstantial evidence—on this record, Beverly could have raised at least a reasonable doubt and had a different outcome at trial had counsel provided adequate representation.

As described above, there are a few categories of inconsistent evidence: time, place, manner and method of the alleged assault, and related physical evidence. The significance of each category varies. For instance, the confusion about what time the incident occurred is less consequential than the shifting theories concerning how Beverly allegedly assaulted T.B. The record's evidentiary inconsistencies deserve examination.

*Time*. The initial category of inconsistent evidence concerns when the alleged assault occurred. At the preliminary examination, T.B. stated that this incident occurred in the afternoon.

The sister, Tiretha, and the mother, Tia, testified that they learned of the incident before noon, which is consistent with the physician's report. Respondent's appellate briefing states that it happened "late one evening." (Resp't Br., ECF No. 15 at 3).

*Place.* It is also not clear where within the grandmother's home the assault allegedly occurred. T.B. said that Beverly assaulted him in his older sister's upstairs bedroom, and Tiretha was asleep in her room at the time of the incident. Elsewhere, T.B. said that his sister was not in the same room. At trial, the sister testified that T.B. told her the assault occurred in the basement (Beverly's living quarters). The sister agreed with defense counsel that it would be untrue to say that she was asleep in the room at the time of the alleged incident, as T.B. stated at the hearing.

*Method & Manner.* Likely the most important inconsistency that the record reveals is the method and manner of the alleged sexual contact.

At the preliminary hearing, T.B. said that Beverly tickled his genital area and penetrated him rectally with a finger but never suggested penile penetration or oral intercourse. At trial, the sister initially testified that T.B. told her of sexual contact and touching but disclaimed specific knowledge, and her recollections were more in line with what T.B. reported. Post-recess, her memory changed considerably. She then said that T.B. told her Beverly penetrated T.B.'s rectum with his penis. At the hospital, T.B. told the physician that an unidentified man put his penis in T.B.'s rectum; according to the doctor's notes, T.B. "[n]ever said anything . . . about the individual sucking his penis," nor anything about inserting a finger in his rectum.[5] (Tr., R. 5-8, PageID #

---

[5] The Michigan Court of Appeals stated incorrectly: "The examining physician testified that the victim told him that defendant put his penis in his rectum." (Order, R. 5-12, PageID # 959). Of course, this is untrue, as even a cursory glance at the record would show. All that the physician recalled was that T.B. said that "this man put his penis in his rectum." (Tr., R. 5-8, PageID # 820). The doctor did not identify Beverly or otherwise indicate the assailant's identity.

830). The mother's testimony was more consistent with the sister's testimony and less compatible with T.B.'s memories.[6]

*Physical Evidence of Sexual Abuse.* The physical evidence indicating improper sexual contact is also disputed. In the preliminary examination, Beverly testified that T.B. put his fingers in T.B.'s buttocks, causing his buttocks to "hurt." (Tr., R. 5-2, PageID # 525). Similarly, T.B.'s mother inspected her son's buttocks after T.B. told her that "it was hurting," and the physician said that T.B. "complained of pain around his anus." (Tr., R. 5-8, PageID ## 795, 820). The mother observed "a little blood," but she did not clean T.B. or change her son's clothes before calling the police and going to the hospital. (*Id.* at PageID # 796). The physician did not see "any blood whatsoever." (*Id.* at PageID # 831).

The examining doctor inspected T.B.'s genital, urinary, and anal areas. Of these, T.B.'s anal region had observable tearing and decreased tone but did not require stitching or surgical repair. The doctor concluded that T.B. suffered "some kind of injury . . . something that can only happen with an injury that starts from the outside and goes in." (*Id.* at PageID # 825). At trial, the doctor confirmed that T.B.'s injuries were consistent with an adult male's hands, fingers, penis, or anything "of a similar size" being inserted into the rectum; however, there was no diagnosis that the injury was sustained from a sexual assault specifically. (*Id.* at PageID # 826).

As to the frequency of the sexual contact, T.B. suggested that Beverly "[t]ickling" his genital area and inserting a finger inside his rectum occurred on the same day, not on different days. (Tr., R. 5-2, PageID # 524). However, the physician testified that it would be less common

---

[6] All of these recollections seemed to confuse the prosecution as well, which shifted its theory of the case midway through the very short trial.

to observe T.B.'s injuries, i.e., tearing and decreased tone, with one injury; rather, he would typically expect such injuries to have resulted from multiple episodes.[7]

On balance, the record is rife with material inconsistencies, particularly given the varying accounts between the preliminary examination testimony and the live testimony presented at trial. The majority sweeps away all these inconsistencies by finding that an objection from defense counsel would have been futile given the corroborating evidence. Although the failure to object to the unsworn transcript may not, standing alone, clear the high hurdle *Strickland* establishes, its cumulative effect on the trial "undermine[s] confidence in the outcome." *Strickland*, 466 U.S. at 694. The transcript of T.B.'s statement was the first piece of evidence admitted at trial. It thus laid the foundation for the remainder of the very short trial. Without the preliminary examination statement, the prosecution had nothing other than indirect evidence connecting Beverly to T.B.'s injuries. The contradictory live testimony at trial left ample room for doubt as to Beverly's guilt, particularly since the main indirect evidence incriminating Beverly was elicited at the sister's prompting when she asked the child: "[D]id Emmanuel touch you or anything?" (Tr., R. 5-8, PageID # 760). Nearly everything T.B.'s mother knew derived from the sister, and everything the sister knew derived from her suggestive prompting. Without the unreliable unsworn statement, the live testimony failed to offer any direct support of Beverly's guilt.

The admission of the preliminary examination transcript, in conjunction with the testimony at trial, left the jury with a much more incriminating account than that which was possible without the transcript. There is a reasonable probability that the evidence would have been more persuasively presented on Beverly's behalf, with competent representation, in a way that would have changed the result. As a result, Beverly was not afforded the effective assistance of counsel

---

[7] The physician noted that the mother told him that she never harbored any "previous suspicions of child abuse" inflicted on T.B., and that her son had "[n]o previous history of trauma." (Tr., R. 5-8, PageID # 821).

guaranteed by the Sixth Amendment.  There is also no physical evidence linking Beverly to T.B.'s physical injuries, and "[t]he lack of physical evidence confirming sexual activity meant that this was necessarily a close case at the trial level." *See Hodge*, 426 F.3d at 387.  Accordingly, defense counsel's failure to object to the highly incriminating preliminary examination transcript cast Beverly in a negative light and likely affected the jury's verdict for this reason as well.

In sum, counsel's failure to object to the admission of the unsworn transcript, coupled with the assurances of the transcript's reliability, worked to Beverly's actual and substantial disadvantage, tainting the entire trial with constitutional error. *People v. Anderson*, 446 Mich. 392, 407 n.37 (1994) ("While credibility contests are not uncommon in criminal sexual conduct cases, the wrongful admission of corroborating testimony 'on either side could tip the scales' and result in harmful error.") (citations omitted).

## C.  Confrontation Clause

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  It "bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" *Davis v. Washington*, 547 U.S. 813 (2006) (quoting *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004)).  The cross-examination requirement's purpose is to enable the opponent to test witness credibility and the reliability of the proffered testimony.  *Crawford*, 541 U.S. at 61.  "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990).  The right to cross-examine guaranteed by the Confrontation Clause includes the dual rights "to delve into the witness' story to test . . .

perceptions and memory" and impeach the witness by "revealing possible biases, prejudices, or ulterior motives." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).

### 1. Threshold Requirements Under 28 U.S.C. § 2255

Certain threshold requirements must be satisfied before a federal court can reach the merits of a § 2254 petition. Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground independent of the federal question and is adequate to support the judgment. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). The contemporaneous objection rule is commonly applied by Michigan courts to limit consideration of claims on appeal. *Taylor v. McKee*, 649 F.3d 446, 450–51 (6th Cir. 2011).

The Michigan Court of Appeals employed plain-error review to conclude that Beverly failed to preserve his Confrontation Clause challenge because trial counsel failed to make a contemporaneous objection premised upon that constitutional right. Even if Beverly did not make an explicit Confrontation Clause objection, his trial counsel and the prosecutor raised the issue at various points in a way that was adequate to preserve the objection. A review of the trial-court transcript supports the view that Beverly did not procedurally default his Confrontation Clause claim. At trial, the defense provided a contemporaneous objection as follows:

> A preliminary exam is a probable cause hearing. And in that hearing[,] you do have the opportunity to cross[-]examine a witness as it relates to the issue, the very low standard of probable cause.
>
> It's not the type of cross-examination that would take place in this particular matter in a jury trial. And it puts us truly at an unfair disadvantage at this point . . . and all of a sudden[,] the only person that can provide information in terms of what happen[ed] is not available[,] and you want to use a limited preliminary exam transcript that . . . does not fully examine a lot of issues that really this jury has a right to know. What was the defendant wearing, where were you at . . . just nothing in terms of that in that preliminary exam, it just goes to basically the charges that were alleged against my client and what was necessary to get this matter bound over. . . . [T]o . . . allow the prosecution at the eleventh hour to decide that this young man is not available and

therefore he does not have the cross-examination it is necessary when these types of charges are levied against an individual.

(Tr., R. 5-7, PageID # 605–06). Counsel thus invoked the Sixth Amendment when objecting that Beverly would "not have the cross-examination" of "the only person that can provide information in terms of what happene[ed]." (*Id.* at PageID # 605). No doubt, the magic words evincing *Crawford* invocation do not appear until closing arguments, where the defense counsel explained: "[T]he Constitution must mean something. And it must mean that . . . you get a fair trial, you have a right to face your accusers. They want to say at the preliminary exam that's when my client had his right to face his accuser." (Tr., R. 5-9, PageID # 876). But even the objection presented during the cases in chief demonstrates a contemporaneous objection on Confrontation Clause grounds. The state court erroneously rejected Beverly's claim as procedurally defaulted even though the claim is preserved for appellate review.

## 2. Admission of T.B.'s Prior Statement

To admit into evidence a testimonial, hearsay accusation against a defendant, a prosecutor must show the declarant's unavailability and that the defendant had a prior opportunity to cross-examine the declarant. The Federal Rules of Evidence add an additional requirement. Rule 804(b) provides an exception to the hearsay rule for testimony from a declarant who is unavailable at trial if the party against whom the testimony is offered had an "opportunity and similar motive" to examine the declarant. This is not such a case; rather, the state court came to an unreasonable conclusion of law when it decided that the transcript's admission did not violate Beverly's confrontation rights.

### a. *Beverly was denied an adequate opportunity for cross-examination*

Defense counsel's questioning at the preliminary hearing did not fulfill the constitutional requirements. Such hearings are almost by definition less searching than cross-examination at

trial. Under Michigan law, a preliminary hearing's only function is "to determine [whether] a crime has been committed and, if so, [whether] there is probable cause to believe that the defendant committed it." *People v. Redden*, 290 Mich. App. 65, 83 (2010) (quoting another source). Unlike the right to confront adverse witnesses, such a hearing is a creature of statute that is "not constitutionally required." *People v. Yost*, 468 Mich. 122, 125 (2003). But, under some circumstances, if sufficiently thorough, a preliminary hearing can constitute an adequate prior opportunity for cross-examination. *Compare Al-Timimi v. Jackson*, 379 F. App'x 435, 438 ("[A] preliminary examination is only to determine whether probable cause exists, . . . [so] defense counsel may lack adequate motivation to conduct a thorough cross-examination."), *with id.* ("[T]he opportunity for cross-examination afforded at a preliminary examination may satisfy the Confrontation Clause in at least some circumstances.").

No irreducible constitutional minimum exists for establishing when prior testimony at a probable-cause hearing satisfies the Sixth Amendment; however, guideposts do exist. For example, in *California v. Green*, 399 U.S. 149 (1970), the Supreme Court found no Confrontation Clause violation where the trial court admitted a witness' prior statement at a preliminary hearing. The Court found that questioning at the probable cause hearing satisfied the confrontation right:

> Porter was under oath; respondent was represented by counsel—the same counsel in fact who later represented him at the trial; respondent had every opportunity to cross-examine Porter as to his statement; and the proceedings were conducted before a judicial tribunal, equipped to provide a judicial record of the hearings. Under these circumstances, Porter's statement would, we think, have been admissible at trial even in Porter's absence if Porter had been actually unavailable, despite good-faith efforts of the State to produce him. That being the case, we do not think a different result should follow where the witness is actually produced.

*Id.* at 165; *see id.* ("[T]he instant preliminary hearing [was not] significantly different from an actual trial to warrant distinguishing the two cases for purposes of the Confrontation Clause.").

Conversely, the probable-cause hearing at issue in this case lacks the hallmarks of a prior opportunity for cross-examination.

No oath was ever administered to T.B. The majority opinion seems comfortable collapsing the distinction between sworn and unsworn testimony; however, that distinction matters. "[T]he oath awakens the conscience. . . . Likewise, some minimum capacity for recording and relaying truthful information is a precondition to a meaningful oath to tell the truth, *which is a necessary element of cross-examination*." *Haliym v. Mitchell*, 492 F.3d 690, 702–03 (6th Cir. 2007) (emphasis added). The Confrontation Clause "insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury." *Green*, 399 U.S. at 158. Even if it were to be argued that T.B. did not need to be formally placed under oath because he was a child, he also was not adequately questioned by the court to insure that he understood the importance of telling the truth. As the prosecution acknowledged at a pre-trial hearing: "This case rests on the testimony of the seven[-]year[-]old victim." (Tr., 5-5, PageID # 557). Yet, T.B. never testified under oath, not even a single time; nor was he ever adequately counseled to tell the truth—in lieu of taking an oath. The absence of an oath might alone indicate that the preliminary hearing failed to "closely approxiamat[e] those [circumstances] that surround the typical trial." *Green*, 399 U.S. at 165; *see Shaw v. Collins*, 5 F.3d 128, 132 n.8 (5th Cir. 1993) (finding relevant the lack of oath in a pre-trial interview of minor declarant found unavailable to testify); *cf. Miller v. MacLaren*, 737 F. App'x 269, 275 (6th Cir. 2018) (finding the admission of a preliminary hearing transcript did not violate the Sixth Amendment where, in part, witness was under oath).

Moreover, the cross-examination requirement's purpose is to allow a criminal defendant to test the credibility of a witness and the reliability of the testimony before a jury. *See Crawford*,

541 U.S. at 61. The preliminary hearing in the case *sub judice* was concerned solely with examining the existence of probable cause, not credibility or motive. As a consequence, Beverly never had an adequate opportunity to test T.B.'s lack of credibility before a jury; the jury could not draw conclusions about the child's credibility based on his demeanor. The jury was invited to blindly believe the truth of the unsworn statement from an unseen and unheard complainant. *Phillips v. Neil*, 452 F.2d 337, 348 (6th Cir. 1971) ("The drastic impairment of the right of cross-examination resulting from the admission of this type of unsworn observation and opinion evidence will be recognized by anyone familiar with the psychology of a jury trial."). Because the testimony was never evaluated or subjected to testing in the context of an adversary proceeding, the interests the Confrontation Clause is designed to protect remained unprotected in this case; as a result, the state court's decision constituted an unreasonable application of *Crawford*.

The final point concerns the defense's varying motives during the probable cause hearing versus trial. When assessing whether an adequate opportunity for cross-examination exists, this Court asks, "what else [a petitioner] would have accomplished by cross-examining [an unavailable declarant]." *MacLaren*, 737 F. App'x at 276. Otherwise stated, the question is whether a habeas petition can "show any new and significantly material line of cross-examination that was not at least touched upon in the first [proceeding]." *Mancusi v. Stubbs*, 408 U.S. 204, 215 (1972). This guidance from *Mancusi* is in lockstep with *Green*'s reminder that an opportunity for cross-examination exists if the prior questioning is not "significantly limited in any way in the scope or nature." *Green*, 399 U.S. at 166.

The answer to that question is self-evident in this case: Beverly would have been confronted with T.B. at trial, allowing him to test the witness' knowledge once the prosecution revised its theory of guilt. It must be remembered that the prosecution moved to amend the

information from "finger in anal opening" to "penis in anal opening and/or finger in anal opening" midway through the very short trial. Even if the prosecution had a right to do so, consistent with state law, compliance with state evidentiary laws does not insulate conduct from constitutional scrutiny. Thus, even reducing the Confrontation Clause standard to the most basic notion of having a chance to ask questions, regardless of adequacy thereof, Beverly never had the opportunity to question T.B. about the revised charge.

In summary, the record compels a different conclusion than that of the majority opinion. While the differences between a preliminary hearing and a trial are sometimes not consequential for confrontation purposes, they made all the difference here. The goal of the preliminary hearing was just to "bind the Defendant over on . . . [the] charges contained in the complaint." (Tr., R. 5-2, PageID # 530). The questioning, in this case, did not satisfy the Constitution's confrontation requirements. There was no oath, and the jury was unable to assess T.B.'s credibility (but instead had to watch a prosecutor play the role of the young complainant). T.B. never gave sworn testimony subject to adversarial testing. Beverly was convicted on evidence he was unable to test through cross-examination. The child was not even questioned sufficiently to determine whether he understood that he was required to tell the truth. For these reasons, the Michigan court unreasonably applied *Crawford*'s requirement that a defendant has a prior opportunity to adequately cross-examine an unavailable declarant.

### b. *Substantial and Injurious Effect*

One last issue must be addressed with respect to the Confrontation Clause violation. Beverly is not entitled to habeas relief unless he can show that the error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting another source). A "substantial and injurious effect or influence" means

"actual prejudice." *See id.* at 637–38. "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *O'Neal v. McAninch*, 513 U.S. 432, 438 (1995) (quoting another source) (emphasis omitted). Constitutionally ineffective assistance of counsel meets the "actual prejudice" test under the Sixth Amendment. *Joseph v. Coyle*, 469 F.3d 441, 462–63 (6th Cir. 2006).

As discussed in the ineffective-assistance-of-counsel section, the other evidence introduced against Beverly was not sufficient to secure a conviction without T.B.'s unsworn statement. *Cf. MacLaren*, 737 F. App'x at 277 (finding no "substantial and injurious effect" on the verdict where other evidence abounded as to the petitioner's culpability). Any error from admitting T.B.'s preliminary examination testimony was not mitigated by the admission of the other testimony. No physical evidence linked Beverly to the crime. The testimony at trial did not corroborate T.B.'s account any more than it contradicted it. Moreover, as discussed previously, the trial court judge, prosecutor, and defense counsel misled the jury to believe that T.B.'s statement was reliable and trustworthy. As a result, the jury was unable to properly weigh the preliminary examination evidence, and the admission of the transcript had a prejudicial effect on the verdict.

The majority opinion also collapses the distinction between sworn and unsworn testimony. It is hardly a controversial statement to say that assuring that a witness is qualified to tell the truth is a basic rule of evidence, one which gains added importance when the speaker is a young child reporting familial sexual abuse. In fact, the state trial judge warned the jury against ignoring the distinction between sworn and unsworn testimony. He explained "evidence" was defined as "the sworn testimony of witnesses" and cautioned jurors that it was "[v]ery, very important that that is the only thing you base your opinion on." (Tr., R. 5-8, PageID # 629). The judge repeated these

admonitions in his closing remarks: "When you discuss this case and decide on your verdict, you may only consider the evidence that has been properly admitted in the case. . . . Make your decision only on the evidence that I let in[] and nothing else." (Tr., R. 5-9, PageID ## 885–86). Yet, the trial court steered the jury into exactly the undesirable scenario the judge warned against, i.e., rendering a decision upon unsworn testimony that was not properly admitted. The admission of the unsworn transcript was an error that undoubtedly had a substantial influence on the proceedings, such that the conviction should not stand. *See O'Neal*, 513 U.S. at 432.

Finally, respondent contends that there is no evidence that T.B. would have testified any differently had he been sworn. This argument misreads the record. Rather, nothing indicates that had the trial court administered a competency evaluation to T.B. that he would have been found competent to testify. For example, in a questionable tactic, the prosecution cast doubt on T.B.'s intelligence. When asking the trial court to declare T.B. "unavailable" under MRE 804(a)(4), the prosecutor submitted: "I think your Honor should find that this was an infirmity. For whatever reason[,] the child is slow . . . He's not your average smart seven-year-old . . . he's been held back a grade . . . It's clear that he's infirmed." (Tr., R. 5-7, PageID # 603). During closing arguments and rebuttal, she told the jury:

> You also had read to you, and you can take it into the jury room with you, [T.B.'s] preliminary exam testimony where he answered the questions. He wasn't the smartest or most articulate kid . . . [H]e's seven years old[,] and he's not a very smart seven-year-old.

(Tr. R., 5-9, PageID ## 866, 881). Further, the trial court judge said: "There was an extensive effort to try to make [T.B.] answer questions by the [trial c]ourt itself, first of all, and he refused to answer any questions at all. He wasn't under any duress or stress or anything else he just refused to talk . . . he simply refused to talk." (Tr., R. 5-7, PageID # 607). Accordingly, it is doubtful that the court would have even permitted T.B. to testify at the outset, which additionally demonstrates

the danger of admitting unsworn testimony where that unsworn testimony parades itself before the jury as sworn and reliable.

For these reasons, it is obvious that the Confrontation Clause error in Beverly's case had a substantial or injurious effect or influence in determining the jury's verdict and therefore was not harmless. *See Brecht*, 507 U.S. at 623. Accordingly, I respectfully dissent.